## ARWOOD v. UNITED STATES.

### No. 9200.

Circuit Court of Appeals, Sixth Circuit.
April 13, 1943.

Walter P. Armstrong, of Memphis, Tenn. (Bailey Walsh and Walker Percy, both of

Memphis, Tenn., on the brief), for appellant.

C. P. J. Mooney, of Memphis, Tenn. (Wm. McClanahan and R. G. Draper, both of Memphis, Tenn., on the brief), for appellee.

Before HICKS, ALLEN and HAMILTON, Circuit Judges.

HICKS, Circuit Judge.

Appellant, Clyde Arwood, was indicted for the murder, on November 21, 1941, of William M. Pugh, an officer, employee and agent in the service of the Internal Revenue of the United States, with the rank of Investigator in the Alcohol Tax Unit, Internal Revenue Bureau, of the Treasury Department. The indictment charges that, at the time he murdered Pugh, he knew that Pugh was engaged in the performance of his official duties and that appellant murdered him on account of the performance of his official duties and while in their performance.

The indictment was based upon Section 253, Title 18 U.S.C.A., which provides "whoever shall kill as defined in sections 452 and 453 of this title * * * any officer, employee, agent, or other person in the service * * * of the internal revenue * * * while engaged in the performance of his official duties, or on account of the performance of his official duties, shall be punished as provided under section 454 of this title."

Section 452, Title 18 U.S.C.A., provides that murder is the unlawful killing of a human being with malice aforethought and that every murder perpetrated wilfully, deliberately, maliciously, premeditatedly or perpetrated from a premeditated design unlawfully and maliciously, is murder in the first degree, and that any other murder is murder in the second degree.

Section 453, Title 18 U.S.C.A., so far as is material here, provides that "manslaughter is the unlawful killing of a human being without malice. It is of two kinds: Voluntary—Upon a sudden quarrel or heat of passion." We do not quote the Code definition of involuntary manslaughter because it has no application here.

Appellant entered a plea of not guilty and upon the trial his motion for a directed verdict was overruled and he was convicted of murder in the first degree and sentenced to death. Hence this appeal.

Although assuming different forms, appellant's principal complaint is, that the evidence does not support the verdict. Error was also assigned upon the failure of the court to grant certain requested instructions and upon certain portions of the charge itself.

Under appellant's plea of not guilty he introduced lay and medical testimony tending to prove that he was emotionally unstable and psychologically maladjusted. We have examined this evidence and are of the opinion that it was not of such character that the jury should have believed it or have entertained any reasonable doubt as to his responsibility and no such claim is made for it here, and the contention that there was error in denying certain requests for instructions with reference thereto seems to have been abandoned.

There is no substantial controversy touching the determinative facts. Pugh, James Howes and Clarence Rossner were in 1941 Investigators for the Alcohol Tax Unit, Bureau of Internal Revenue, and worked out of the office at Memphis, Tennessee. Howes testified that on November 1, 1941, complaint was received of an alleged distillery located in the vicinity of Hale's Point, Lauderdale County, Tenn., and within the jurisdiction of the Memphis office; and that they were advised by the informant that Arwood operated it.

On November 5th Pugh, Howes and other officers investigated. The distillery was found in a patch of open woods about a quarter of a mile from the house where appellant lived with his parents, and approximately 3,150 feet therefrom by public, field and woods roads. Between the Arwood house and the woods was an expanse of field. The distilling apparatus was installed in an underground room, with a trapdoor-covered stairway descending thereto, the door to which was secured by a Yale padlock. Howes testified that the odor of fermenting mash was strong around the vents and door.

Several observation trips were made before the still was broken into and destroyed on November 20th. On none of these trips was anyone seen around the still site. However, certain things were noted which, taken together, tended to implicate the appellant as the operator apart from the charge made by the informant. On November 5th, as the officers approached the vicinity of the still, they heard wood-chop-

ping nearby. It ceased shortly, and Howes met appellant driving out of the woods in a two-wheeled cart, on one side of which was an axe and on the other a saw. A thermos jug was wired on the rear. The point of meeting, the officers discovered later, was within 150 feet of the place where the wood had been cut, and around 400 feet from the still site and near the turn-off point thereto. The two men spoke and introduced themselves by name, although Howes did not disclose his business. In response to questions from Howes, appellant talked about timbering and hunting in the neighborhood.

On November 7th, Howes, Pugh and others revisited the still site and found fresh, two-wheeled cart tracks leading from the place where the wood had been cut over to the still site where some wood had been stacked up. Some had been placed under the trapdoor. On November 19th, they found fresh foot tracks leading to the still. The wood under the door was missing. An Ingraham watch with a piece of string tied to it was picked up at the entrance of the still.

On November 20th, Howes, Pugh and Rossner, feeling that their business in the neighborhood had become known to the operator, broke into the still room, finding wooden barrels of mash and complete distilling equipment except for the coils. It was not a registered distillery. After preserving samples of the mash, and certain articles which might bear fingerprints, and after taking samples of firewood from the wood pile and still site to show the similarity, they destroyed the equipment and set fire to the pit. On the same day they showed the watch to woodcutters who were working about a quarter of a mile from the still and were advised that appellant had a similar watch. (This testimony was objected to.) They stopped also at the Arwood home and asked for appellant. He was away, but they were told by his mother that he had lost his watch and that it was similar to the Ingraham watch they had found, except as she recalled, it had a piece of leather on it instead of the string.

These events led up to and culminated in the tragic event of November 21st.

On that morning Pugh, Howes and Rossner returned to the Arwood home. There was testimony by one Haynes and by one Van Thompson, who had together bought liquor from appellant earlier that morning, that appellant had stated that he was ex-

pecting revenue men, that on the day before they had torn up his still in which he had invested $60.00, and that if they came down and mistreated his mother he would "get" one, that he had a gun. They testified that there was no evidence that he had been drinking. There was positive evidence that he was sober.

Howes indicated that they had taken out no warrant, and that the visit was simply "a follow-up investigation of this distillery to complete the case." He got out of the car and walked toward the gate and saw appellant coming from the back of the lot from the direction of the toolshed. Appellant said, "Hello, Mr. Howes, come on in." They shook hands and Howes immediately identified himself as an Investigator, exhibited his badge, mentioned the still, the smoke from which was plainly visible, and stated that they had found certain things implicating him, appellant. The latter at first denied any knowledge of the still, but then admitted having dug the pit for two other men. When Howes mentioned the firewood, he admitted that he had cut it for those men at so much a rick. All this time appellant was moving freely about the yard. Howes introduced deceased to appellant as an Investigator of the Alcohol Tax Unit. Howes then told appellant that he wanted Pugh to hear the conversation. He called to him and the two met him as he came into the yard. A workman in the toolshed appeared and appellant excused himself and walked to the rear of the lot, Pugh and Howes following.

After some further conversation, Pugh produced the Yale padlock taken from the still door and said, "Arwood, we believe you have the key to this lock." Appellant replied, "No, Mr. Pugh, I don't." Asked for his keys, he said, "They are in the house," and the three started for the house, appellant leading the way.

The house was of one story with an attic, with the main floor about eight feet above the ground, resting on wooden pillars. The space underneath was open to the outside, and was used as a shelter for the two-wheeled cart, firewood and other miscellany. Steps led up at the front and back, and a hallway ran in line with the two sets of steps entirely through the house. The house faced west and there were two rooms to the north of the hall, and one to the south, with a screened-in porch to the rear of it, opening onto the back steps. The front rooms were bed-

rooms and the kitchen was to the rear on the north. The house stood in a fenced area roughly 100 feet across the front and 135 feet deep. The toolshed and chicken house were in the fenced area at the southeast corner.

Without objection from appellant, Pugh and Howes followed him up the back steps and into the house. Howes testified that appellant went into the south bedroom and "As we went in I looked around on the porch and in the kitchen" for firearms. Neither he nor Pugh did any searching. No keys were found and the three went to the toolshed where Arwood again looked for keys. Finally, he produced two from his pocket which did not fit the lock.

In the toolshed, the Investigators saw a complete copper coil, minus fittings, which would have fitted the oil drums found in the still room. They saw some one gallon glass jugs similar to those found at the still. Pugh picked these up and smelled of them. When confronted with the copper coil, appellant admitted that he had helped fit up the still, he having contended up to that time that the pit he had dug and the firewood he had cut were for a dry kiln.

Howes testified that "During all our conversation with him he was pleasant. He showed no hard feelings in any way. He was carrying on a normal conversation with us. He showed no signs of drinking or of having had a drink." Howes then said to appellant that he had told part of the truth and that he would feel better if he told the whole truth. To which, "He smiled and said yes, he would tell us the whole truth." He then said, "I'm going in the house to see my mother a minute." Neither Pugh nor Howes made objection, and Howes testified that he felt no alarm in allowing him to go into the house alone, that there had been no quarrel, that Rossner hadn't even gotten out of the car, and that Pugh's manner toward appellant had been pleasant.

The agents had done no searching, had molested nothing when they were in the house, had not even spoken to appellant's mother, although Howes had seen her. Outside and in they had but followed appellant's apparently willing lead, and had touched nothing except the jars in the toolshed and some sugar sacks in the chicken house, which Rossner testified Pugh had looked into at the time he picked up the sugar sacks.

When appellant went to the house the second time, the agents followed. They did not climb the steps, but went to the left of them to the edge of the house. Howes went underneath to a woodpile where he saw a thermos jug, which he smelled. Pugh was standing a few feet to the south of the steps, out from under the house in the clear, and was using the Yale padlock to crack some pecans.

At this moment, about a half hour after their arrival, Howes, who was still under the house, saw a "blast" strike Pugh in the lower part of his face. Rossner from the front heard the shot, looked up and saw appellant in the doorway with a gun pointed downward and fired two shots at him. Pugh, horribly wounded, ran past Howes, under the house, to the front and was assisted into the car by Rossner. Howes joined them and they drove to Dyersburg, where Pugh died some thirty minutes later.

We think there is substantial evidence to support a verdict of murder in the first degree, as that offense is defined in Sec. 452; but appellant contends that not having been indicted thereunder, he cannot lawfully be convicted unless the evidence shows that he killed the deceased "while engaged in the performance of his official duties, or on account of the performance of his official duties" as set forth in the statute under which he was indicted, to wit, Sec. 253, and that there was no such evidence.

It is uncontroverted that the deceased and his associates Howes and Rossner, were Investigators of the Alcohol Tax Unit, and hence were officers, employees and agents in the service of the Internal Revenue. See Brown v. Zerbst, 5 Cir., 99 F.2d 745. Further, it is clear that at various times from November 5th up to and including the date of the killing, these officers were making investigations with a view to discovering the identity of the operator of an unregistered still, as was their duty under Treasury Decision 4662, pursuant to Sec. 22, Title 5 U.S.C.A. They were so engaged when the deceased was killed; and appellant knew who they were and what they were doing.

Appellant takes a different view of the probative effect of the evidence. He contends that they were not engaged in the performance of their official duties but were making an unlawful invasion of his

home and an unreasonable search, prohibited by the Fourth Amendment, and that therefore the statute under which he was indicted afforded the deceased no protection.

We cannot accept this view. We need not determine whether the deceased and his associates were unlawfully invading appellant's home or were engaged in an unreasonable search. However pertinent that inquiry might become in a prosecution of appellant for the operation of an unregistered distillery, it is not necessary to decision here. The fact remains that the entry of the deceased into the house or upon the premises and any search made there was in the course of the investigation and germane to the performance of the duties of the officers while bona fide acting under the color of authority. Even were we to assume that their conduct was unlawful, the worst that can be said of it here is, that it amounted to a trespass. But a trespass neither justifies nor excuses murder. Wharton on Homicide, 3rd ed., p. 620, § 400. There is nothing in the evidence that would justify even manslaughter. There was no provocation for the killing; there was no violent entry upon the premises or into the house; there was no unlocking or opening of closed doors, or the disturbance of anything on the premises or in the dwelling. There were no hot words, no assault or threatened assault upon appellant, no threats, no show of violence, and no attempt to make an arrest.

We think the motion for a directed verdict was correctly overruled.

In the argument the court's charge was criticized. It was contended that the court did not analyze the evidence and apply the law thereto. This complaint is made here for the first time. There were no objections to the general charge or specific requests to summarize the evidence. Ordinarily the criticism would come too late, but this is a capital case and we consider it. See Max Stephan v. United States, 6 Cir., 133 F.2d 87, decided by us February 6, 1943. The particular contention is, that because it was possible under the indictment for the jury to have returned a verdict upon either of the degrees of offenses embraced thereunder, the court should have stated the evidence in detail and instructed the jury under what state of facts, if found by them, the appellant would have been guilty of either of these offenses.

We do not think the charge susceptible to the criticism. The court instructed the jury,

"You jurors are the sole judges of the evidence, also the judges of the law as applies to the facts in the case, but cannot disregard the law as given you by the court," and pointed out with commendable clarity and in meticulous detail the elements which constitute the offenses of murder in the first degree, murder in the second degree, voluntary manslaughter, and even involuntary manslaughter, and followed all this with the statement, "I have given you the distinguishing characteristics of the four grades of felonious homicide embraced in this indictment."

The court then instructed the jury that if it found the appellant guilty beyond a reasonable doubt it was the duty of the jury to decide the grade of offense of which he was guilty. More than this was not required. We must assume that the jury were men of intelligence and sound judgment and that they were able to comprehend the charge.

In Stilson v. United States, 250 U. S. 583, 588, 40 S.Ct. 28, 30, 63 L.Ed. 1154, it was said: "3. It is contended that the court did not analyze and discuss the details of the evidence. The trial judge left matters of fact to the determination of the jury in a charge commendable for its fairness. Certainly the lack of discussion in detail does not amount to a valid objection; particularly in the absence of any specific request for comment upon any special phase of the testimony."

The Government introduced certain reports of the deceased to his superior officer as to his activities from November 5th to and including November 8, 1941. These were introduced for the purpose of showing that the deceased was engaged between those dates in the discharge of his duties as an Investigator of the Alcohol Tax Unit. These reports were objected to upon the ground that they covered a period too remote from the date of the killing and that they were nothing more than hearsay.

It is true that they referred to "the Clyde Arwood still" and in this respect they tended to show that appellant was guilty of another offense than the one with which he is here charged, to wit, the operation of the distillery. However, we find nothing harmful in these reports in view of the substantial evidence directly connecting appellant

with the still and his admission to the officers that he had dug the pit and helped to install the apparatus.

■ Appellant also complains that one of his witnesses, May Taylor, was permitted on cross-examination to testify that she had been a witness for appellant on his trial for killing a deputy sheriff. This was of course objectionable but did not constitute reversible error when considered in connection with one feature of appellant's defense, to wit, that he was of low and irresponsible mentality. To support this defense, appellant himself had introduced testimony to the effect that he had committed other crimes and had killed a deputy sheriff while under the influence of liquor. Under these circumstances the testimony of May Taylor was not prejudicial.

We find no prejudicial error upon the record in other respects and the judgment is therefore affirmed.

HAMILTON, Circuit Judge (dissenting).

I find myself in disagreement with the majority insofar as it is stated in the opinion that the circumstances under which the deceased and his associates were on appellant's premises at the time of the homicide have no bearing on the degree of the guilt of appellant. While a mere trespass against property does not justify the taking of human life and is not of itself sufficient to reduce the homicide to manslaughter, yet if there be evidence in the record from which a jury may infer that the killing was the result of a sudden, violent impulse of passion provoked by the trespass or by the unlawful restraint of a person's liberty, acted on before the passion had time to cool, the jury may conclude that the trespass or the unlawful restraint of liberty might amount to such a reasonable provocation as in law would justify the excitement of passion and thus operate to reduce the offense from first degree murder to a lesser offense.

The hostile mind is essential to the crime of murder, and therefore unless the matters which are in evidence convince the jury beyond a reasonable doubt of the malignancy of the mind, the crime is not made out although other degrees of homicide may be established by the evidence. The fact is the same in all, the death of the person is the imputed crime but the intention makes all the difference and he who kills is pronounced a murderer in the first degree or the second degree or manslaughter, voluntary or involuntary, as the circumstances by which his mind is interpreted by the jury, show it to have been cankered by deliberate wickedness or stirred up by sudden passion, or some excusable conduct shown by the evidence. The intentions of men are inferences of reason from their actions. Proof of their actions is undoubtedly most convincing proof of their intentions, but there are actions which by circumstances may be qualified from their original prima facie character or appearance. This qualification is the foundation of all defense against imputed crime. A mortal wound without adequate provocation is a just foundation of an indictment for murder, but the accused may reduce the crime from murder to manslaughter or excusable homicide depending on the circumstances.

In the case at bar, there is evidence in the record that appellant committed the crime of murder in the first degree. Proof of appellant's threats before the killing was established by some of the witnesses and others testified that the still which was destroyed belonged to appellant. The jury could have concluded from these facts that his act was with malice aforethought. There is likewise evidence in the record from which the jury could have concluded that appellant was laboring under such mental disturbance caused by a reasonable and adequate provocation as would ordinarily so overcome and dominate or suspend the exercise of judgment as to make appellant incapable of forming and executing that distinct intent to take human life essential to murder in the first degree, and to cause him to act from the impelling force of the disturbing cause rather than from real wickedness of heart or from cruelty and recklessness of disposition.

The uncontradicted evidence shows that the deceased and his associates went to appellant's dwelling house without a warrant of arrest or one to search the premises and neither the deceased nor any other officer advised appellant of the purpose of their visit. After they were admitted to the premises, they confronted appellant with what they believed to be incriminating evidence of his connection with the still and commenced a general search of his premises. At no time did the agents notify appellant he was under arrest or that they intended to arrest him nor did they advise him they wished to search his house.

The sanctity of a person's dwelling place has been always, and justly, a favored tenet of our people. They have looked at its invasion with disfavor. However, the law has removed the sacred shield from the dwelling if it becomes a refuge for the lawless, and our lawmakers have wisely provided that the officer may invade such dwelling for the purpose of making arrests or for searching it for instruments of crime or for evidence which establishes crime when he acts on probable cause or with a warrant. When public officers come to the house armed with specific authority to arrest or search, it is the duty of the dweller to yield immediately to the voice of authority, but when the attempted arrest is without probable cause or without a warrant of arrest or the search has no connection with an arrest or is without a search warrant, the abhorrent and unreasonable nature of the invasion is such that if the circumstances show the person whose dwelling place is invaded was laboring under such mental disturbance by reason thereof as to suspend the exercise of judgment, the killing of the intruder may reduce the degree of the offense lower than murder in the first degree.

The facts concerning the killing of the deceased were such that the jury under appropriate instructions might have found there were such mitigating circumstances as to relieve appellant of the severe sentence of death.

Out of the law's jealous anxiety for the security of personal freedom, the crime of murder does not always arise from the taking of the life of an officer. When an officer, with the power of arrest or the right of investigation of crime, acts in the execution of his duty, the law casts a peculiar protection around him and consequently if he is killed in the performance of his duty, it is murder in the first degree, even though there is such a want of premeditation as in ordinary cases would reduce the crime to manslaughter, but when such officer is acting without warrant and is searching the premises of the accused in violation of his constitutional rights, the officer is not entitled to this peculiar protection and consequently the crime of taking his life may be reduced to voluntary manslaughter when the evidence shows the offense is committed in sudden heat and passion or is attended by circumstances affording reasonable provocation. Wharton's Criminal Law, Book Two, Section 414, 8th Ed.; John Bad Elk v. United States, 177 U.S. 529, 538, 20 S.Ct. 729, 44 L.Ed. 874; Starr v. United States, 153 U.S. 614, 621, 14 S.Ct. 919, 38 L.Ed. 841; Brown v. United States, 159 U.S. 100, 102, 16 S. Ct. 29, 40 L.Ed. 90; Brown v. United States, 5 Cir., 47 F.2d 681.

In my opinion the court should have submitted to the jury the question of the legality of the authority of the deceased officer to be on appellant's premises and also the legality of the manner in which he was executing that authority at the time of the homicide and if the jury believed from the evidence that the deceased officer was acting illegally and as a direct and proximate result thereof, appellant killed the deceased, the jury could, in its discretion, fix appellant's punishment at either death or life imprisonment.