Anastasio Lawrence **AMAYA**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

**No. 15388.**

United States Court of Appeals
Ninth Circuit.

June 25, 1957.

Rehearing Denied Aug. 6, 1957.

———◆———

Hugh R. Manes, Los Angeles, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., Louis Lee Abbott, Bruce A. Bevan, Jr., Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before LEMMON, BARNES, and HAMLEY, Circuit Judges.

LEMMON, Circuit Judge.

Striving to stem the swelling tide of "wetbacks"—illegal immigrants from Mexico—that is sweeping into the United States, for years American immigration authorities have progressively tightened their vigilance over the ramparts they watch.

"Pushed by swollen population, inflated prices, and unemployment," says an article in the Stanford Law Review,[1] "pulled by the promise of work at a liv-

---

1. "Wetbacks: Can the States Act to Curb Illegal Entry?", issue of March, 1954, Volume 6, Number 2, Pages 287–288.

ing wage, [the wetbacks] are pouring across the border in what has become a full-scale invasion."

This invasion, the article continues, "in its current proportions constitutes a critical threat to the health, safety and general welfare of the people of the border states."

Even this lightly-limned background will perhaps assist us in better understanding the legal as well as the sociological problems implicit in the instant case.

1. Statement of the Case

On August 22, 1956, the appellant and Dan Casias were indicted on the charge that they "did forcibly assault, resist, oppose, impede, intimidate and interfere with William A. Sherrill, an immigration officer, as the defendants then and there well knew, engaged in the performance of his official duties." The statute alleged to have been violated was 18 U.S.C.A. § 111, "assaulting a federal officer."

On August 30, 1956, a jury returned a verdict against each defendant. On September 24, 1956, the appellant was sentenced to serve one year in the penitentiary. On September 27, 1956, he filed a notice of appeal. Casias has abandoned his appeal.

2. The Appellee's Evidence

On May 14, 1956, William A. Sherrill, an investigator for the United States Immigration-Naturalization Service, Department of Justice, reported to his superiors that he had been informed that three aliens illegally in the United States "were generally to be found in the 'La Chiquita' [2] bar", in Pico, California. Because Sherrill happened to reside one block from "La Chiquita" and had received "the information in the first place", he "was able to work to better advantage than any one else of our group", according to Robert Winston, supervisory investigator for the Immigration-Naturalization Service, stationed at Los Angeles.

On Sunday, May 20, 1956, Sherrill's informant called on the immigration officer at the latter's residence and reported that one of the three aliens was at that moment in "La Chiquita". After arranging by telephone with the sheriff's office in East Los Angeles to book any prisoners that he might take, Sherrill picked up his handcuffs and revolver and went to the bar.

The immigration officer walked directly to the rear of "La Chiquita" and, with his credentials in his "right hand started talking to the persons seated at the bar". Sherrill would show his badge and would say, "I am an immigration officer. I would like to know your place of birth, please."

Juana Antonia Cabana, who at that time was working at "La Chiquita", testified in broken English that Sherrill "was not mad" and "he questioned very nice to the other one voice".

At that time the interpreter was summoned. Miss Cabana said that Sherrill "was not talking either too loud or too low".

With notable understatement, the appellant generously concedes that he "interfered with Sherrill". Let us see precisely what this "interference" was, according to the testimony offered by the appellee.

After Sherrill had questioned five or six persons at the bar, he "noticed a man edging toward the front door at the bar, who answered the description of the man that [Sherrill] was looking for".

The immigration officer testified that he "ran toward the front of the bar and intercepted [the suspect] at the door". Sherrill announced that he was an immigration officer, held out his credentials,

2. In both his briefs, counsel for the appellant consistently spells the name of the bistro "La Chaquita". Since the spelling "La Chiquita" appears throughout the transcript of record, and means in Spanish "The Little One" (feminine), we regard it as the probably correct form, and are adopting it in this opinion. No standard Spanish dictionary to which we have access contains the word *chaca* or its diminutive *chaquita*.

and said, "I would like to know your place of birth".

The man replied in English, "What difference does it make?"

Sherrill replied:

"Because I am an Immigration Officer, I must know your place of birth". The suspect began, "What difference—"

At that moment, according to Sherrill, things began to happen. He was struck from the rear, upon the base of his neck and upon his arms. His arms were pulled behind him and he was pulled back into the bar. As he was swung around he found the appellant facing him. The latter "proceeded to rain blows at my throat, face, neck, and chest with his fists".

Although some one was still holding his arms behind him, Sherrill was able to get his hand into his trousers pocket and pull out his revolver.

At that juncture, the appellant "turned and ran" and the rest of the crowd, like the old soldier, "faded away" —or an any rate "got out of the way". Sherrill pursued the appellant "to the back of the bar into a storeroom".

The appellant "reached down, picked up a bottle of beer, smashed it against the others". The record does not tell us how strong the beer was, but the strength of the container is indicated by the fact that when it was "smashed" against its fellows, it did not break.

The appellant tried to assault the officer with the beer bottle.

"I told him that I would shoot him if he did not drop it, which he did," Sherrill testified.

Sherrill tried to remove the appellant from the bar, and the latter resisted.

"However," the officer continued, "I was able to get him out into the front of the bar", and "I placed my handcuffs on his right wrist."

Just then Sherrill spied the man who had first struck him, and he attempted to handcuff the appellant to this first assailant.

Once again, however, Sherrill was "jumped from the rear", and he was "forced to the floor".

"The defendant Casias had hold of my right arm," Sherrill testified. "First he tried to strike the gun from my hand and then he forced my arm back and behind me, twisting my revolver from my wrist, tearing my thumb in doing so."

Sherrill was kicked while he was on the floor. The gun was taken from his hands, "and then they released me". Apparently as indestructible as the beer bottle, Sherrill was able to pick himself up.

"There was a lot of hollering," Sherrill continued. "I explained to them again that they would have to stay there, and * * * [the appellant] and Casias, I believe, stayed in the bar".

In another understatement, Sherrill testified that, because he was "obviously not among friends", upon demand of the appellant, Casias, and others, he removed the handcuffs from the former. After Sherrill's gun was taken from him, about a half a dozen or more of the former onlookers apparently had returned to the scene, although the record is not precise regarding "their exits and their entrances".

Sherrill then "went next door to the liquor store and asked that a call be placed to the Sheriff's Substation, asking for help." When he returned to the bar, he overheard Casias say to the appellant, "That's our story and we are going to stick to it".

Sheriff's deputies later arrived and the appellant and Casias were placed under arrest.

3. The Applicable Statute
Section 111 of Title 18:

"§ 111. *Assaulting, resisting, or impeding certain officers or employees.*

Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of his official duties, shall be fined not more than

$5,000 or imprisoned not more than three years, or both.

"Whoever, in the commission of any such acts uses a deadly or dangerous weapon, shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

4. Questions Presented

1. Was Sherrill engaged in the performance of an official duty within the meaning of 18 U.S.C.A. § 111, supra, when he entered "La Chiquita" Cafe to make an arrest of patrons of the Cafe without a warrant, etc.?

2. Was the exclusion of evidence as to "the nature and identity of Sherrill's informer" reversible error?

█ 5. Sherrill Was Performing His Official Duty When He Entered La Chiquita, Even If He Intended Ultimately To Make an Arrest Without a Warrant.

(a) An Inquiry as to Probable Cause for Arrest Is Moot When No Arrest Is Actually Made.

In the instant case, no arrest had been actually made by Sherrill when he was attacked. As we have seen, he was merely questioning several men in the bar as to where they were born. When he was attacked, he did put handcuffs upon the appellant, as he had a right to do, both in self-defense and since an offense was being committed in his presence.

The attack upon the immigration officer was therefore wholly unjustified, both in law and in morals.

In Carter v. United States, 5 Cir., 1956, 231 F.2d 232, 236, certiorari denied 1956, 351 U.S. 984, 76 S.Ct. 1052, 100 L.Ed. 1498, the Court said:

"The remaining complaints have no substance. As an arrest or an attempted arrest at the time Poe first came up to the car was not made, the legality of Poe's or Ponto's actions are [sic] in no way affected by the legality or illegality of an arrest which did not take place."

Like the Carter case, supra, Hall v. United States, 5 Cir., 1956, 235 F.2d 248, 249, was one that called for the interpretation of the statute that we are here considering. There the Court observed:

"The contention of appellant that the officers had no right to arrest him is without basis as no arrest was attempted at the time the officers first approached Hall." [3]

Indeed, in a murder case at least, it has been held that even though an officer might be unlawfully invading a home, he is entitled to the law's protection if he is bona fide acting under the color of authority. In Arwood v. United States, 6 Cir., 1943, 134 F.2d 1007, 1010, certiorari denied 1943, 319 U.S. 776, 63 S.Ct. 1436, 87 L.Ed. 1722, the Court used the following language:

"It is uncontroverted that the deceased and his associates * * * were Investigators of the Alcohol Tax Unit, and hence were officers, employees and agents in the service of the Internal Revenue. [Case cited.] Further, it is clear that * * * these officers were making investigations * * * as was their duty * * *.

"Appellant takes a different view of the probative effect of the evidence. He contends that they were not engaged in the performance of their official duties but were making an unlawful invasion of his home and an unreasonable search, prohibited by the Fourth Amendment, and that therefore the statute under which he was indicted afforded the deceased no protection.

"We cannot accept this view. We need not determine whether the deceased and his associates were unlawfully invading appellant's home or were engaged in an unreasonable search. However pertinent that inquiry might become in a prosecution of the appellant for the operation of an unregistered distillery, it is not necessary to decision here.

3. Cf. Hall v. United States, 4 Cir., 1955, 222 F.2d 107, 108.

*The fact remains that the entry of the deceased into the house or upon the premises and any search made there was in the course of the investigation and germane to the performance of the duties of the officers while bona fide acting under the color of authority."* [Emphasis supplied.]

■ **(b) Sherrill's Entry Into "La Chiquita" Was in the Lawful Performance Of His Official Duties.**

In the first place, the "La Chiquita" Bar was not a private residence, but a public shop, where people could come and go as they pleased, provided they comported themselves properly.

In McWalters v. United States, 9 Cir., 1925, 6 F.2d 224, it was objected "that the prohibition agents entered the premises without having a search warrant". This Court answered the argument as follows:

"But as the uncontradicted evidence was that the place was a soft drink parlor, open to the public, the agents had a right to enter * * *."

Furthermore, once Sherrill was lawfully in the bistro, he had the right and duty to question any individual whom he believed to be an alien. Section 1357(a) of 8 U.S.C.A. provides:

"(a) Any officer or employee of the [Immigration and Naturalization] Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

"(1) To interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States; * * *."

Section 287.1(c) of the Rules and Regulations Implementing the Immigration and Nationality Act, United States Congressional and Administrative News, 83rd Congress, First Session, 1953, Volume 2, Page 2617, not cited by counsel, reads as follows:

"(c) *Certain powers of immigration officers.* Any immigration officer is hereby authorized to exercise anywhere in the United States all the powers conferred by section 287 of the Immigration and Nationality Act [8 U.S.C.A. § 1357], including:

"(1) The power to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States; * * *."

See also 8 CFR (1952 Revision) § 242.11 (a) and (b).

We have seen that Sherrill was struck from the rear while he was questioning the man who was "edging toward the front door at the bar". Whether the suspected individual was under a duty to reply or not, the immigration officer *was clearly within the scope of his duty in inquiring.*

In Carter v. United States, supra, 231 F.2d at page 235, it was pointed out that whatever might be the suspect's duty to answer, the officer "undoubtedly had the right to ask questions".[4]

■ **6. The District Court Did Not Err in Refusing to Compel Sherrill to Disclose the Identity of the Informer.**

The other issue raised by the appellant is that "It was prejudicial error for the trial court to preclude appellant's counsel from inquiring into the identity of Sherrill's alleged informer".

In support of this thesis, it is argued that the appellee had to show "that the officer acted upon probable cause in entering the La Chaquita [*sic*] Cafe".

The proposition that either an officer or a private individual requires "probable cause" to enter a barroom is novel indeed! Every day men—and women too—enter taverns to get a "quick one" or to use the telephone or to "borrow" a toothpick or to visit the "powder room" or just to "hang around".[5]

---

4. See also Hall v. United States, supra, 235 F.2d at pages 248–249.

5. The May, 1957, issue of the Stanford Law Review, Volume 9, Number 3, Page 522, Note 31, cites People v. Gonzales, 2d Dist.1956, 141 Cal.App.2d 604, 297 P.2d 50, to the effect that "The officer who searched the defendant declined to

In Roviaro v. United States, 1957, 353 U.S. 53, 59–62, 77 S.Ct. 623, 627, 1 L.Ed. 2d 639, decided on March 25, 1957, the Supreme Court outlined the boundaries of the rule:

"What is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violation of law to officers charged with enforcement of that law. [Cases cited.] The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. *The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.*

\* \* \* \* \* \*

"A further limitation on the applicability of the privilege arises from the fundamental requirements of fairness. Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action. Most of the federal cases involving this limitation on the scope of the informer's privilege have arisen where the legality of a search without a warrant is in issue and the communications of an informer are claimed to establish probable cause. In these cases the Government has been required to

disclose the identity of the informant unless there was sufficient evidence apart from his confidential communication.

\* \* \* \* \* \*

"We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." [Emphasis supplied.]

In the instant case the immigration investigator had the right to enter a bar, which was open to the public, to interrogate "any alien or person believed to be an alien as to his right to be or to remain in the United States." The problem here "is one that calls for" safeguarding "the public interest in protecting the flow of information". On the other hand, since the officer had the right to enter the saloon in the first place, knowledge of the identity of the informant would in no way have aided the appellant in exercising his "right to prepare his defense". It merely would have subjected the informant to the danger of a physical attack perhaps comparable in brutality to the one visited upon the immigration officer while in discharge of his duty.

7. Conclusion

In the instant case, the immigration officer was performing his statutory duty—and received a sound pummeling and kicking for his pains.

reveal the name of the 'reliable' informer, and a ground of defendant's appeal was that 'the trial court prejudiced his cause by refusing to allow him to cross-examine the officers as to the name of their informant'. Id. [141 Cal.App.2d] at [page] 607, 297 P.2d at [pages] 51–52. The district court of appeal held that there was no error in this ruling since

such a disclosure 'would have affected the public welfare adversely'. Ibid."

See also Scher v. United States, 1938, 305 U.S. 251, 254, 59 S.Ct. 174, 83 L. Ed. 151; Smith v. United States, 9 Cir., 1925, 9 F.2d 386, 387; Sorrentino v. United States, 9 Cir., 1947, 163 F.2d 627, 628.

Since Sherrill had the legal right to enter the barroom without a warrant, and also was authorized by statute "to interrogate any * * * person believed to be an alien as to his right to be or to remain in the United States", no useful purpose would have been served, so far as the appellant was concerned, by compelling the officer to divulge the identity of the informer. There is evidence in the record to justify the inference that if the informer, carrying the scarlet letter "S" on his brow, had become known, he might have suffered the punishment so frequently dealt to "stoolies".

Accordingly, the judgment of conviction is

Affirmed.