**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Edwin Affron KARTMAN, Defendant-Appellant.**

**No. 22984.**

United States Court of Appeals Ninth Circuit.

Oct. 9, 1969.

894

Aubrey Grossman (argued), San Francisco, Cal., for appellant.

Jerrold M. Ladar (argued), Asst. U. S. Atty., Cecil F. Poole, U. S. Atty., San Francisco, Cal., for appellee.

Before BROWNING, CARTER and HUFSTEDLER, Circuit Judges.

BROWNING, Circuit Judge:

Defendant, a ministry student, went to the Armed Forces Induction Center in Oakland, California, on December 18, 1967, to "lend * * * moral support" to demonstrators protesting the Selective Service System and this country's participation in the Vietnam conflict. In the course of the demonstration, defendant kicked Richard M. St.Germain, a deputy marshal of the United States, who, with another federal officer, was engaged in subduing and arresting a demonstrator. Defendant was charged with a violation of 18 U.S.C. § 111.[1] He was convicted, and appealed. We have concluded that several errors and defects in the proceedings, considered cumulatively, may have affected defendant's substantial rights. We therefore reverse and remand for a new trial.

The indictment alleged that defendant assaulted Deputy Marshal St.Germain "knowing him to be such officer." The trial court, holding that the quoted language was surplusage, declined to instruct the jury that the government must prove that the defendant knew Mr. St.Germain to be a deputy marshal.

The court's ruling was correct. Knowledge of the official status of the victim of a forcible assault is not an element of that offense under 18 U.S.C. § 111. McEwen v. United States, 390 F. 2d 47 (9th Cir. 1968).[2] The allegation of such knowledge in the indictment was therefore surplusage which it was unnecessary for the government to prove. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 222, 60 S.Ct. 811, 84 L.Ed. 1129 (1939); Gawne v. United States, 409 F.2d 1399, 1403 (9th Cir. 1969); Castle v. United States, 287 F.2d 657, 660 (5th Cir. 1961); Gambill v. United States, 276 F.2d 180, 181 (6th Cir. 1961).

Defendant argues that the interpretation given section 111 in McEwen violates the holding of Morissette v. United States, 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952), that legislative silence does not eliminate criminal intent from a statutory codification of a common-law crime which required mens rea. But McEwen holds only that specific knowledge that the victim is a federal officer is not an essential element of forcible assault under section 111. McEwen does not hold that the statute

---

1. 18 U.S.C. § 111 reads:

"Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of his official duties, shall be fined not more than $5,000 or imprisoned not more than three years or both.

Whoever, in the commission of any such acts uses a *deadly or dangerous* weapon, shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

The persons designated in 18 U.S.C. § 1114 include "any United States marshal or deputy marshal * * *."

2. Decisions to the same effect subsequent to McEwen include Burke v. United States, 400 F.2d 866 (5th Cir. 1968); Pipes v. United States, 399 F.2d 471 (5th Cir. 1968). Earlier authorities holding that such knowledge is a necessary element of the offense are collected in United States v. Chunn, 347 F.2d 717, 721 n. 13 (4th Cir. 1965), and United States v. Wallace, 368 F.2d 537, 538 n. 1 (4th Cir. 1965).

eliminates mens rea—the evil purpose or mental culpability which was the essential mental component of common-law assault and battery.[3]

This interpretation of the forcible assault prohibition in section 111 as requiring only mens rea, and not also specific knowledge of the victim's official status, comports with the legislative purpose, which was simply to provide a federal forum when the enumerated offenses were committed against federal officers engaged in the performance of federal duties. United States v. Wallace, 368 F.2d 537, 538 (4th Cir. 1966); United States v. Lomardozzi, 335 F.2d 414, 416, 10 A.L.R.3d 826 (2d Cir. 1964); see also Burke v. United States, 400 F.2d 866, 868 (5th Cir. 1968).[4]

Acceptance of this conclusion, however, establishes the premise of defendant's alternative argument, namely, that the inclusion in the indictment of an allegation of specific knowledge was error.

Defendant contends that this error was prejudicial because he built his defense upon the assumption, justified by the indictment, that the prosecution would fail unless the jury was satisfied beyond a reasonable doubt that the defendant knew that Mr. St.Germain was a deputy marshal at the time of the assault. See Gawne v. United States, supra, 409 F.2d 1399, 1403–1404 (9th Cir. 1969), and cases there cited.

Much of the apparent strength of this suggestion of prejudice fades on an examination of the record.

Defendant was aware of the government's position from the beginning of trial, and did not object when the court indicated that it would reserve decision of the issue to the settlement of instructions. Furthermore, the court properly took the position that since mens rea was an essential element of forcible assault under section 111, the defense of "mistake in fact" was available to the defendant, and the jury could take into account, in that connection, whether defendant knew or should have known that he was assaulting a law enforcement officer.[5]

---

3. All common-law crimes, with the exception of public nuisance, required mens rea as well as actus reus. Bishop, Criminal Law 192 (9th ed. 1923), Kenny, Outlines of Criminal Law 20,337–38 (16th ed. Turner 1952); Perkins, Criminal Law 829 (1957).

4. Forcible assault clearly does not come within the class of "public welfare offenses" which the legislature might wish to punish regardless of the actor's intent. Perkins, supra, 830–31, Sayre, Public Welfare Offenses, 33 Colum.L. Rev. 55, 83 (1933); 111 U.Pa.L.Rev. 506, 508 (1963).

5. Where bad purpose is an element of an offense, a mistake of fact which negates the existence of that state of mind is necessarily a defense. Therefore it is a defense to a charge involving mens rea that the defendant reasonably believed the facts to be other than they were if his act would have been innocent had the facts been as defendant reasonably believed them to be. See Bishop, supra, 204–05; Perkins, supra, 825; 1 Wharton, Criminal Law and Procedure 382; Keedy, Ignorance and Mistake in the Criminal Law, 22 Harv.L.Rev. 75, 82; Model Penal Code § 2.04, Comment (Tent.Draft No. 4, 1955). This defense is available to a "Good Samaritan" charged with assault and battery as a result of his intervention, under a reasonable but mistaken apprehension of the facts, on behalf of a person resisting arrest. Perkins, supra, 883, 910–11; Model Penal Code §§ 3.04 and 3.05 (Tent. Draft No. 8, 1958). But see People v. Young, 11 N.Y.2d 274, 229 N.Y.S.2d 1, 183 N.E.2d 319 (1962), criticized in 63 Colum.L.Rev. 160 (1963) and 111 U.Pa. L.Rev. 506 (1963).

The defense is available in prosecutions for forcible assault under 18 U.S.C. § 111. Since all of the justifications for recognizing the defense with regard to common-law offenses apply equally to the statutory codifications of such offenses, the defense is applicable to statutory offenses unless excluded expressly or by reasonable implication. People v. Vogel, 46 Cal.2d 798, 299 P.2d 850, 855 (1956). As noted, the defense arises by necessary implication from the requirement of mens rea in such offenses. Unless the defense is allowed, conduct which is blameless by definition, and often highly commendable, is branded as criminal; punishment is imposed for no rational purpose; uneven enforcement of the statute is encouraged; and public confidence and respect for the law is di-

Thus, as the case was submitted to the jury, defendant's evidence as to his lack of knowledge of Mr. St.Germain's official status was relevant to his defense. His claim of prejudice is therefore reduced, essentially, to the assertion that the emphasis of his presentation, rather than its substance, was adversely affected by the error in the indictment.

We would not think defendant's substantial rights were affected had no other error occurred; but two other errors in the course of trial also adversely affected the presentation of the defense.

When defendant intervened, Mr. St. Germain was attempting to arrest a demonstrator who had admitted, in response to Mr. St.Germain's questioning, that he was of draft age and did not have a Selective Service registration card in his possession. Defendant submitted a written offer of proof that binding instructions had been issued to United States marshals not to make an arrest for non-possession of a draft card unless the alleged violation had been investigated by the Selective Service System and that agency had requested action. The proof was not offered to challenge the legality of the arrest, but to establish that at the time of the incident Mr. St.Germain was not "engaged in * * * the performance of his official duties," as required by section 111. The trial court rejected the offer.

The proffered evidence apparently was rejected on the ground that Mr. St. Germain was authorized by statute (18 U.S.C. § 3053) to make an arrest without a warrant for an offense against the United States committed in his presence, as he was engaged in doing, and the offer of proof related only to "an internal administrative matter" which could not alter the statute.

 However, 28 U.S.C. § 569(c) vests authority in the Attorney General to "supervise and direct United States marshals in the performance of public duties * * *"; [6] and we have no doubt that under this broad grant of authority the Attorney General could properly limit the occasions upon which United States marshals and their deputies might exercise the general statutory power to make arrests. It was error, therefore, to reject the offer of proof as irrelevant, assuming its truth.[7]

minished. *See* Dubin, *Mens Rea* Reconsidered: A Plea for a Due Process Concept of Criminal Responsibility, 18 Stan. L.Rev. 322 (1966); Hart, The Aims of the Criminal Law, 23 L. & Contemp. Problems 401, 422 (1958); 63 Colum. L.Rev. 160 (1966); 111 U.Pa.L.Rev. 506 (1966).

In the only case to directly confront the issue, the Seventh Circuit recently held that the defense is available in prosecutions under section 111, United States v. Grimes, 413 F.2d 1376 (1969). This view is impliedly supported in Burke v. United States, 400 F.2d 866, 867–868 (5th Cir. 1968); United States v. Heliczer, 373 F.2d 241, 249 (2d Cir. 1967); United States v. Wallace, 368 F.2d 537, 538 (4th Cir. 1966). (In citing *Grimes* and *Heliczer* we do not mean to approve any suggestion in these opinions that knowledge possessed by the person whom the defendant seeks to aid, but not by the defendant, may be relevant to the defense. *See* Perkins, *supra*, 911–12.)

6. 28 C.F.R. § 0.5(a) provides that the Attorney General shall "Supervise and

direct the administration and operation of the Department of Justice, including the offices of * * * United States Marshals, which are within the Department of Justice."

7. The record suggests that the offer of proof may not have been well founded, and it would have been entirely appropriate for the court to require that the good faith of the offer be supported by calling the witness and making some inquiry before acting upon the offer. Scotland County v. Hill, 112 U.S. 183, 186, 5 S.Ct. 93, 28 L.Ed. 692 (1884); *see* C. McCormick, Evidence § 51, at 113 (1954). The court did not adopt that course in this case and we must presume that the offer was made in good faith. Scotland County v. Hill, *supra*; *see also* Platte Valley Cattle Co. v. Bosserman-Gates Live Stock & Loan Co., 202 F. 692, 694, 45 L.R.A.,N.S., 1137 (8th Cir. 1912), and cases there cited.

We find no merit in defendant's contentions that Mr. St. Germain was not engaged in the performance of his official duties because the arrest was made in violation of the arrested demonstra-

Defendant also challenges the limitation imposed upon the cross-examination of Mr. St.Germain. Defendant was permitted to bring out that Mr. St.Germain entered the United States Marine Corps at seventeen, served in the Corps for twenty years, and became a deputy marshal a few months after his retirement from the Corps, about a year and a half before the incident in question. Defendant then sought to inquire of Mr. St. Germain whether he had any bias or prejudice—any feelings of opposition, anger, or bitterness—toward persons who participated in anti-draft and anti-war demonstrations, and hence against defendant as a part of that group, which might color or influence his testimony.[8]

The government objected to this line of questioning, and the objection was sustained. Although the ground of the court's action is not stated, there is an intimation that the court may have felt that the inquiry was not directly related to the witness's bias or prejudice toward the defendant as an individual, and was improper for that reason.

▇▇ The law recognizes "the force of a hostile emotion, as influencing the probability of truth-telling * * *; and a partiality of mind is therefore always relevant as discrediting the witness and affecting the weight of his testimony." 3 Wigmore, Evidence § 940, at 493 (3d ed. 1940). *See also* Wynn v. United States, 130 U.S.App.D.C. 60, 397 F.2d 621, 623–624 (1967); C. McCormick, Evidence § 40 at 81–82 (1950). Prejudice toward a group of which defendant is a part may be a source of partiality against the defendant. He is therefore entitled to a reasonable opportunity to cross-examine witnesses as to the existence of any such prejudice, and

its possible effect upon their testimony. Jacek v. Bacote, 135 Conn. 702, 68 A.2d 144, 146 (1949); Magness v. State, 67 Ark. 594, 50 S.W. 554, 59 S.W. 529 (1899); *see also* People v. Christie, 2 Abb.Pr. 256, 259, 2 Park.Cr.R. 579, 583 (N.Y.S.Ct. 1st D.1855); United States v. Lee Huen, 118 F. 442, 463 (N. D.N.Y.1902) (dictum).

▇▇ The government argues that the error in denying defendant the opportunity to cross-examine Mr. St.Germain in this respect was harmless.

Mr. St.Germain was the government's sole witness. His testimony was in substantial conflict with that of defendant's witnesses on several critical matters, notably the appearance of the attempted arrest to uninformed bystanders, the amount of force used by the officers and the nature of defendant's intervention, including the force which he used.

Complete foreclosure of cross-examination as to a subject matter relevant to the witness's credibility, which may have deprived the jury of access to information bearing upon the trustworthiness of crucial testimony, cannot be treated either as falling within the court's discretion, or as harmless error. *See, e.g.,* Smith v. Illinois, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968); Gordon v. United States, 344 U.S. 414, 417, 423, 73 S.Ct. 369, 97 L.Ed. 447 (1953); *see also* District of Columbia v. Clawans, 300 U.S. 617, 630–631, 57 S.Ct. 660, 81 L.Ed. 843 (1937); United States v. Palermo, 410 F.2d 468, 472 (7th Cir.1969); McConnell v. United States, 393 F.2d 404, 406 (5th Cir. 1968); Grant v. United States, 368 F.2d 658, 661 (5th Cir.1966).

tor's First and Fifth Amendment rights, and the principles of Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

8. The government argues that the defendant's initial questions were too general, and were not followed by additional questions directed specifically to whether the witness's ability to observe, recollect,

and testify accurately may have been impaired by his emotional involvement. It is clear from the record, however, that the defendant intended to raise the general issue of his right to cross-examine with respect to the subject matter, and not merely the propriety of the particular questions which had been put to the witness, and that the court ruled on the general issue.

Moreover, as we have said, our conclusion that defendant's substantial rights were affected rests upon the cumulative impact of the errors which occurred.

Reversed and remanded for a new trial.

JAMES M. Carter, Circuit Judge (dissenting):

I must respectfully dissent.

This is an unusual case. A divinity student is charged with assaulting a deputy U. S. Marshal. He admits kicking the Marshal. His defense was twofold. First he claimed he did not know the person kicked was a U. S. Marshal. This was resolved against him by the trial court and by the majority here in its correct holding that knowledge of the official status of the victim of the assault is not an element of the offense under 18 U.S.C. § 111.

Second, his factual defense was that he went to the aid of a person he believed was being assaulted. He received complete and favorable instructions to the jury on this issue and they found him guilty.

The majority was compelled to hold that official status of the victim was not an element of the offense by our decision in McEwen v. United States, 390 F.2d 47. They now *reach* for other grounds to reverse the conviction. The majority opinion bases its reversal on two supposed errors which cumulatively, it is said, require reversal.

### I.

The first error found was the rejection of the offer of proof of instructions to the United States Marshals not to arrest in certain Selective Service cases.[1] The majority opinion does not so state but gives the impression that this was an issue taken from the jury. It was instead an issue of law decided by the trial court. Appellant's counsel specifically agreed that the issue of whether the deputy Marshal was "engaged * * * in his official duties" (18 U.S.C. § 111), was *not* a question for the jury. (Rep.Tr. 308–9).

The court considered counsel's offer of proof and stated he took judicial notice of the courtroom remarks of U. S. Attorney Cecil Poole in another proceeding. Far from showing any express instructions to U. S. Marshals as to arrests in Selective Service cases, Poole's remarks rather refer to matters of prosecutive policy. But at best the offer of proof showed "* * * a national policy of the Department of Justice that the FBI and United States Marshals would not either question people about possession of draft cards (looking toward arrest or prosecution therefor) or arrest for nonpossession * * *" of draft cards. "The policy * * * was communicated to the United States Marshals, as their binding instructions, by the Department of Justice." (Clk. Tr. 3–4).

From the showing made, the policy was at best a nebulous one. The court stated "I don't know of any regulations that have been cited that could have the standing of law in respect to the enforcement of the Selective Service Act by the Marshals." Appellant's attorney then conceded "I don't know if they exist. I believe they probably don't exist." (Rep.Tr. 314).

The majority cite 28 U.S.C. § 569(c) vesting authority in the Attorney General to "supervise and direct United States marshals in the performance of public duties * * *" and 28 C.F.R. § 0.5(a) to the same effect. The majority then states "* * * [W]e have no doubt that under this broad grant of authority the Attorney General *could* properly limit the occasions upon which United States marshals and their deputies might exercise the general statutory

---

1. St. Germain, the deputy Marshal assaulted, had questioned one Jones, a demonstrator, about his failure to have a draft card in his possession. He arrested Jones and was attempting to put hand cuffs on Jones when appellant kicked him.

power to make arrests." [Emphasis added]

We have no doubt either. But appellant's counsel admitted no such regulatory limitations existed; and even if they existed, the majority do not tell us how a violation of such a supposed regulation would constitute a defense in a criminal action.

It is conceded that the statute, 18 U.S.C. § 3053 permits a Marshal to make an arrest without a warrant for an offense committed in his presence. Although the Marshal may have violated instructions, he had power to make an arrest, and his acts were merely subject to departmental discipline. The majority, in substance, read the instructions as amending the statute passed by Congress. If the Marshal had authority to make the arrest under the statute, the fact that he violated his instructions from the department could not possibly be a defense.

It was not necessary to determine whether the arrest of Jones (to whose aid appellant came) was technically legal. The cases cited by the Government give solid support to the statement that good faith action, under color of authority by a federal officer is sufficient to satisfy the "engaged in his official duties" standard. United States v. Heliczer (2 Cir.1967), 373 F.2d 241, 245 states the rule. " 'Engaged in * * * performance of official duties' is simply acting within the scope of what the agent is employed to do. The test is whether the agent is acting within that compass or is engaging in a personal frolic of his own. It can not be said that an agent who has made an arrest loses his official capacity if the arrest is subsequently adjudged to be unlawful." *Heliczer* concerned a prosecution for attack on a federal narcotics agent under 18 U.S.C. § 111. Defendants claimed that the arrest by the agent was unlawful as outside the scope of official duties. The court rejected the argument.

The other cited cases similarly involve convictions for attacking federal officials. Efforts to categorize the official

as working outside the scope of his authority failed in each instance. Walks on Top v. United States (9 Cir.1967), 372 F.2d 422, cert. denied 389 U.S. 879, 88 S.Ct. 109, 19 L.Ed.2d 170 (1967) held a Bureau of Indian Affairs agent was in the scope of official duty where he was working with state law enforcement officials after being deputized as a state official.

Arwood v. United States (6 Cir. 1943), 134 F.2d 1007, cert. denied 319 U.S. 776, 63 S.Ct. 1436, 87 L.Ed. 1722 (1943) rejected a claim that an Alcohol Tax Unit investigator's participation in an illegal search might remove him from the protection of the federal "scope of duty" statute. The court held it need not determine the validity of the search. "The fact remains that the entry of the deceased [federal official] into the house or upon the premises and any search made there was in the course of the investigation and germane to the performance of the duties of the officers while bona fide acting under the color of authority." (134 F.2d p. 1011).

Finally Hodgdon v. United States (8 Cir.1966), 365 F.2d 679, rejected a claim that an arrest warrant was invalid and hence that a federal marshal seeking to enforce it was acting outside his duties. Although the court found the warrant proper, it noted: "We believe it is part of the official duties of a marshal, in criminal as well as civil cases, to execute all warrants which reasonably appear to be valid. At any rate, no person should be entitled to resist with deadly force a marshal operating under color of authority, even though it is later found that no actual authority existed." (p. 685). See also Amaya v. United States (9 Cir.1957), 247 F.2d 947.

More startling and erroneous is the narrow scope given by the majority to the deputy Marshal's duties on the day in question. They seem to assume that the only duty he was engaged in was the arrest of Jones referred to in note 1. Deputy Marshal St.Germain testified he was on duty as a deputy Marshal on the day in question along with other depu-

ties; that he was instructed to be at the Center to protect government property; that in the course of his duties he went to Armed Forces Induction Center at 4:45 A.M. and was in the building until 8:15 A.M.; that he at first couldn't get in because the area was crowded with people; that Chief Deputy Marshal Blazzard was inside and couldn't get out; that there was a sit-in in front of each doorway; that police came to the 15th Street doorway and apparently opened the way; that the incident with Jones happened shortly thereafter. (Rep.Tr. 140–144).

We can take judicial notice that the Induction Center was maintained by the government so that registrants and prospective inductees could report thereto, and that the government had an interest in protecting the Center, keeping it open and maintaining access to it. Thus St. Germain was on duty in attempting to maintain order and protect government property. Even if he had no power to arrest, he was engaged in other official duties at the same time. He thus was "engaged in * * * the performance of his official duties."

## II.

The opinion, secondly, finds error in the limitation of the right to cross-examine the deputy Marshal. The opening questions by counsel for the appellant were general questions, directed as to whether or not the deputy Marshal had any bias or prejudice, or any feelings of opposition, anger or bitterness towards *persons* who participated in anti-draft and anti-war demonstrations. The government's objection was sustained.

We think the majority was correct in holding that the trial court sustained the objection *to 'the general line of questions*. All the discussion between court and counsel centered on the question of bias or prejudice toward the Vietnam war demonstrators. When finally the court stated he understood that counsel's questions were "*not* as to whether or not he (the deputy Marshal) had a bias toward this individual defendant." Coun-

sel replied "That's right," and then added "And unless he (the deputy Marshal) attached it to him (the appellant) because he is in that grouping." (Rep. Tr. 163).

But although the objection was sustained to the line of questions as to general bias against the Vietnam war demonstrators, the trial court invited specific questions. But counsel for appellant did not follow up with particular questions as to any bias or prejudice of the deputy Marshal against the appellant himself. The attorney for appellant should have framed particular questions as to the deputy Marshal's supposed prejudice toward the appellant, and the appellant's connection with the group of demonstrators.

The sustaining of an objection on cross-examination to a question framed in general terms, like the general objection to a question, will ordinarily not constitute grounds for an appeal. The duty lies with the party propounding the question to specify with his questions the issue he desires to raise and to obtain a ruling on the specific questions and the objection thereto.

The majority states that a defendant is entitled to a reasonable opportunity to cross-examine witnesses as to the existence of prejudice against a group of which the defendant is a part. The opinion relies on three state court cases decided in 1949, 1899, and 1855, and dictum in a 1902 federal district court case to support this position. In the 1949 case, Jacek v. Bacote, 135 Conn. 702, 68 A.2d 144, the trial court allowed the question as to class prejudice. The reviewing court found the action "was not improper." In the 1899 case, Magness v. State, 67 Ark. 594, 50 S.W. 554, 59 S. W. 529, a witness' prior hostile statement, excluded by the trial court, was clearly directed to the individual defendant. Only in People v. Christie, 2 Abb. Pr. 256, 2 Park.Cr.R. 579 (N.Y.S.Ct. 1st D. 1855) was the appellate court faced with a factual record similar to the present case—a refusal by the trial court to allow questions about a witness'

bias against a general class rather than a particular individual. We would not quarrel with the majority's conclusion that a trial judge may in his discretion allow questions as to bias against a class. However, a *requirement* that he accept such general questions misreads sparse precedent and places an undesirable restraint on the judge's control of trial proceedings.

If it is suggested that the paucity of direct authority in this area is due to the fact that a trial judge rarely denies cross-examination directed to subject matter of the kind involved here, a more plausible explanation, based on the writer's experience of 18 years on a trial bench, is that counsel will usually reframe his question to speak to bias against the individual.

The cases are legion that the scope of cross-examination is largely within the discretion of the trial court and its ruling, absent a showing of abuse of discretion, will not be reversed. Ford v. United States (5 Cir.1956), 233 F.2d 56, 61, cert. denied 352 U.S. 833, 77 S.Ct. 49, 1 L.Ed.2d 53; Mims v. United States (9 Cir.1958), 254 F.2d 654, 659; Sykes v. United States (5 Cir.1966), 373 F.2d 607, 611, cert. denied (1967) 386 U.S. 977, 87 S.Ct. 1172, 18 L.Ed.2d 138; Abeyta v. United States (10 Cir.1966), 368 F.2d 544, 545.

*Sykes* and *Abeyta*, supra, were stronger cases for allowing the question on cross-examination than our case. In each the discretion of the trial court was upheld in sustaining the objection. In *Sykes* a witness' testimony helped place defendant at the scene of a post office robbery. On cross-examination it was revealed that the witness had had a lovers quarrel with the co-defendant. The court refused to allow an inquiry as to whether the witness had assaulted the co-defendant. On appeal the circuit court surmised that the trial judge had felt this evidence was extrinsic to the case and excludable in his discretion. In *Abeyta*, a detective was apparently the key witness in a marihuana conviction. Defendant attempted to show the witness had been about to resign from a previous law enforcement position for going "a little too far in his work." The circuit upheld the discretion of the trial court in excluding the evidence.

More important the question of the deputy Marshal bias was not germane to any material issue. There was never any issue as to whether appellant kicked the deputy Marshal. His own counsel assumed the kicking in his questions to appellant, when he testified in his own defense. Appellant's testimony admitted the kicking.[2] St.Germain and others testified appellant kicked him.

The majority does not tell us just how cross-examination as to the deputy Marshal's bias toward Vietnam war demonstrators would assist the defense on this state of the record. The deputy Marshal testified generally to what occurred on December 18, 1968.[3] But the crucial testimony was that appellant kicked him. Appellant's main defense was his

2. Appellant took the witness stand and at no time denied that he kicked or kneed deputy Marshal St. Germain. The following is from his direct examination by his own counsel:

"Q: Now just before you got involved on December 18 by kicking this man who later turned out to be a Marshal, did any of these ideas go through your mind * * *.

A: I am not sure.

Q: Did you have anything specific in mind when you went up and kicked the * * *.

A: No.

Q: The Marshal.

A: No, other than as I said before to break up the fight." [Rep.Tr. 366–367].

 * * * * *

"Q: What happened after you kicked him?

A: The Marshal that I kicked reached in what I thought was his right hand coat pocket and started to pull something out * * *." [Rep.Tr. 367].

"Q: Did you ever see this Marshal again, the Marshal you kicked?

A: Yes." [Rep.Tr. 371].

3. Summary of the testimony of deputy Marshal St. Germain.

Deputy Marshal St. Germain testified that he had been in the Marine Corps

claimed right to go to the defense of a person being assaulted. The court so instructed. Nothing in St.Germain's testimony affected this defense. In fact St.Germain related how he and the guard were holding Jones on the ground and attempting to hand cuff him at the time appellant intervened.

It is true that St.Germain testified that he twice announced he and the others were Federal Marshals. But the issue of appellant's knowledge that St. Germain was a deputy Marshal was held by the trial court and the majority here to be a matter of law and not of fact and not an element of the offense that the government was required to prove.

We thus have a case where the act in question, the kicking, was testified to by the deputy Marshal and admitted by appellant and where the deputy Marshal's testimony of his encounter with Jones laid the basis for appellant's only real factual defense, viz. that he had gone to the aid of a person being assaulted. And yet the majority holds the sustaining of the objection as to the deputy Marshal's bias against Vietnam war demonstrators, was reversible error.

The case was ably and patiently tried by the judge presiding. Despite a great number of contentions and objections, constitutional and otherwise, all untenable, the trial court afforded the appellant a fair trial and the jury convicted him.

The opinion of the majority will cause only mischief. Trial lawyers will be confused. District Judges will have the opinion cited to them as permitting the most general of questions as proper cross-examination, and the judges will be reluctant to limit cross and require questions as to specific matters. Cases will be delayed by unwarranted cross-examination. It is submitted the majority is in error in its holding, that appellant was not prejudiced on the record here and the decision will be an added obstacle to the administration of justice in the trial courts.

The judgment should be Affirmed.

for 20 years and after his retirement had become a deputy Marshal on August 19, 1965. That he, other deputy Marshals and Foreman a guard, had gone to the Armed Forces Induction Center, Oakland on December 18, 1968. He saw the demonstrators in front of each of the three doors to the Center and subsequently had a conversation with Jones. He told Jones he was a Marshal, showed him his credentials; asked if Jones had any identification, he said he did not; asked if he had a draft registration card and he said no; asked if he was of draft age and he said yes. He then told Jones he was under arrest. He then related that Jones threw his hands up and said, "Oh no" and ran. The guard Foreman grabbed Jones and

Jones kneed Foreman. Then St. Germain grabbed Jones and forced him to the ground; he attempted to put hand cuffs on Jones and saw a group of people coming across the street. He told them that they were Federal Marshals and the man was under arrest and to "leave us alone" and that he was then kicked by the appellant and that appellant ran back into the crowd. That St. Germain went back to where Jones was and appellant came at him again.. This time he took his black-jack out and told appellant they were Federal Marshals and to leave them alone; that he swung the black-jack and kept swinging it but did not hit anyone; that his boss (Chief Deputy Marshal Blazzard) subsequently apprehended Kartman.