**UNITED STATES of America,
Appellee,**

v.

**Juan Ramon FERNANDEZ et al.,
Appellants.**

**Nos. 72–2088, 72–1408 and 72–2089.**

United States Court of Appeals,
Ninth Circuit.

May 13, 1974.

---

Antonio H. Rodriguez (argued), Los Angeles, Cal., T. Roger Duncan (argued), Hollywood, Cal., for appellants.

Earl E. Boyd, Asst. U. S. Atty. (argued), William D. Keller, U. S. Atty., Irving Prager, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Stephen Gilbert, Mexican American Legal Defense Fund (argued), Los Angeles, Cal., for amicus curiae.

Before HUFSTEDLER and WRIGHT, Circuit Judges and ENRIGHT,* District Judge.

ENRIGHT, District Judge:

In August 1971, defendants Juan Ramon Fernandez, Alberto Ortiz and Rodolfo Pena Sanchez were arraigned and pleaded not guilty to an original three count indictment. A superseding indictment was filed September 1, 1971, charging defendants in count one with a violation of 18 U.S.C. § 371, conspiracy, in count two with a violation of 18 U.S.C. § 2114, robbery of mail, money, or other property of the United States, and in count three with a violation of 18 U.S.C. § 111, assault upon a federal officer. Defendants pleaded not guilty to all counts of the superseding indictment.

On November 15, 1971, after lengthy jury trial with a voluminous record, all defendants were found guilty as to all counts. Defendant Fernandez was sentenced to five years on count one, twenty-five years on count two, and ten years on count three, all sentences to run concurrently. Defendant Ortiz was sentenced to five years on count one and ten years on count three to run concurrently. Ortiz was sentenced to twenty-five years on count two, execution of sentence suspended, and he was placed on probation for five years to run consecutive to the term of imprisonment. Defendant Sanchez was sentenced to five years on count one, twenty-five years on count two, and ten years on count three, all terms to run consecutively.

## FACTS

The government's principal witness was the victim, Robert Canales, Special Agent, Bureau of Narcotics and Dangerous Drugs (BNDD).

Canales testified that in February 1971, an inmate in the Los Angeles

---

* The Honorable William B. Enright, United States District Judge for the Southern District of California, sitting by designation.

County Jail telephoned BNDD and indicated he wanted to talk to a BNDD agent. Canales eventually met with the inmate on July 21, 1971, and was given the telephone number of Sanchez. That same day, Canales called Sanchez and indicated that he, Canales, had been told that he could contact Sanchez if he wanted to purchase narcotics, particularly heroin. Sanchez indicated to Canales that he preferred not to converse on the telephone but suggested instead a personal meeting on the following day.

The next day at the agreed time and location, Canales, in possession of government funds, operating in an undercover capacity, and under surveillance by other BNDD agents, met with Sanchez. Negotiations ensued concerning the purchase of two ounces of heroin.

Sanchez then told Canales that they should go to his connection. The two proceeded to ride upon Canales' motorcycle to a particular parking lot. Leaving Canales on the motorcycle, Sanchez stated that he would be back in a few moments with the narcotics.

While Canales remained upon the motorcycle, Sanchez departed the area, only to return momentarily with Fernandez and Ortiz. The trio then left, but minutes later, Fernandez and Ortiz, after certain maneuverings, ran up to Canales with drawn weapons. They demanded that Canales give them all his money. Ortiz ordered Canales off the motorcycle, but Fernandez countermanded the order.

At that time Canales made a movement to get off the motorcycle. Whether the agent was making a move for cover or for his weapon is disputed. Suffice it to say, that at that moment he was shot by Fernandez and Ortiz. The wound so received caused permanent paralysis to Agent Canales.

## ISSUES

The defendants presented fifteen issues on appeal. Those issues sufficiently meritorious as to deserve discussion may be divided into two categories: (a)

the conduct of the trial, and (b) the legal elements of the offenses.

### A. Conduct of the Trial

■ *1. Challenge to Jury Selection.* The defendants have raised several objections to the jury selection process in the Central District of California. The government, however, contends that defendants did not comply with the mandatory provisions of 28 U.S.C. § 1867 (West Supp.1974), challenging compliance with jury selection procedures. We cannot fault the government's position.

■ ■ One additional comment as concerns jury challenge would be beneficial. 28 U.S.C. § 1863(b)(2) allows voter registration lists to be used, unless some other supplemental source is necessary to achieve the policies of 28 U.S.C. §§ 1861, 1862. The Central District General Order No. 55 states a conclusion that no other source is necessary. The defendants argue that the important issue is that there exists no study or evidence to support the finding of General Order No. 55. Rather, defendants assert that "common political experience" belies an assumption that voter registration lists represent a cross-section of the populace. But the defendants have the burden of showing, prima facie, discriminatory practices. Whitus v. Georgia, 385 U.S. 545, 550–551, 87 S.Ct. 643, 646–647, 17 L.Ed.2d 599 (1967); United States v. Butera, 420 F.2d 564, 569 (1st Cir. 1970). "Common political experience" is a far cry from judicial notice, not to mention statistical comparative studies as utilized in Whitus v. Butera. In short, by relying upon "common political experience," defendants would have failed to bear their burden.

■ *2. Search of the Venire.* Prior to the voir dire and selection of the jury panel, at least nine of the prospective jurors (three of whom became jury members and one an alternate) were searched for weapons by the United States Marshals responsible for courtroom security. The search of prospective jurors was curtailed shortly after it

had begun and thereafter, the marshals relied upon presentation of jurors' cards.

The search was conducted in full view of the fifty member venire. It may be presumed that many veniremen knew that such procedure was not customary. For a period of five hours the potential jurors were free to discuss the implications of the search.

Prior to a noon recess, the trial judge indicated that he felt a new venire could be made available within forty-eight hours. After the recess, however, the court, desiring to impanel the jury that afternoon, denied a defense motion challenging the venire. The court stated that balancing the interests of all concerned and the possible prejudice to both sides, the impanelment should go forward. Further, the court intended to purge the prejudice by voir dire, admonition, and challenge, if any. Defense neither offered additional voir dire questions nor subsequently utilized any challenges for cause. The court questioned the panel thoroughly as to possible bias or prejudice resulting from the search.[1] Finally, the defense at one point conceded that the prejudice, if any, might be equally directed to the government as to the defendants.[2] Given the particular circumstances of this case, we cannot conclude that the course chosen by the trial judge was imprudent nor insufficient.

1. THE COURT: In connection with your coming to the courtroom today, did anything occur which influenced you so you cannot be fair and impartial towards all parties, both United States and the defendants?

I have particular reference to the security measures that have been set up outside this courtroom and the information that I have that before the procedure was changed, five or six of you may have been searched.

Do those of you who were searched, or do those of you who observed such searches believe that that in any way influenced you so that you cannot be fair and impartial towards both sides, either the defendants or the Government?

Raise your hands.

VENIREMAN STURLA: I don't feel that I can be fair. Is that what you asked, your Honor?

THE COURT: That is right.

Your name, sir?

VENIREMAN STURLA: John Sturla.

THE COURT: Any others that by reason of anything that occurred today either outside or inside the courtroom feel that way?

(Negative response.)

THE COURT: May I have a showing of hands and identification by name of anyone who was searched?

I will do them one at a time.

We have Mrs. McMillin. What was the nature of the search?

VENIREWOMAN McMILLIN: My handbag and an instrument going down my back.

THE COURT: And Mr. Mitchell.

VENIREMAN MITCHELL: It was one of those little beeper things.

THE COURT: I see. An electronic-type device.

Anyone else?

VENIREMAN GREENLEAF: I had the same as Mr. Mitchell.

THE COURT: And back in the panel, can we reserve those until we get them in the box, gentlemen? .

MR. BROWN: Please, your Honor. I believe there were others in the back row of the jury.

THE COURT: Were there? Did I miss somebody?

Anyone in the back row of the jury that had raised their hand in response to that question?

(Negative response.)

MR. BROWN: I am sorry, your Honor.

THE COURT: With respect to those three of you that did, you heard my questions with respect to whether or not that would influence you either for or against the Government or for or against the defendants, did you not?

(Affirmative response.)

Reporter's Transcript 232–34.

2. THE COURT: That covers the general questions which I intend to ask, although I will be happy to ask any questions in addition to those I did presented by either the Government or the defendants with respect to the search made.

If there are none—

MR. BROWN: Yes, your Honor, there is one.

I had been convinced in my own mind that the search would prejudice the jurors if at all against the defendants. I have reconsidered in view of your Honor's statement that the jurors, if prejudiced, might equally have blamed the Government.

Reporter's Transcript 234–35.

**3.** *Prosecutorial Misconduct.* The defense contends that the prosecuting attorney committed numerous acts of prejudicial misconduct. When the defendants' contentions are accumulated and concentrated within twenty-four pages, comprising one-fifth of the defense brief, they cannot be read without some sentiment that improprieties requiring reversal may have been committed. But when read in the context of a record consisting of nineteen volumes, totaling three thousand pages, the allegations of misconduct become muted. and in light of the overwhelming evidence of guilt, it may be concluded that the trial judge conducted an essentially fair and just proceeding and that the prosecution's misconduct—which did occur in several instances—was not of sufficient moment as to require reversal.[3] *See* Favors v. Eyman, 466 F.2d 1325, 1329 (9th Cir. 1972); Taylor v. United States, 134 U.S.App.D.C. 188, 413 F.2d 1095 (1969).

**4.** *Exclusion of Evidence of Motive.* The theory of the defense case was that the defendants had met Agent Canales under the belief that he was a heroin dealer and had intended to warn him to stop dealing in drugs within the barrios. The defendants testified that they had previously taken such action, both as individuals and as members of an organization, La Casa de Carnalismo, the main goal of which was to eradicate drug traffic and addiction in the Chicano barrios.

The defendants further testified that to accomplish their goal, they and La Casa de Carnalismo, had engaged in a campaign which included counselling drug addicts to seek treatment, speaking to individual youths and to student, youth, and prison groups, as well as attempting to influence legislation. They also testified that they would not report dealers to law enforcement, for if they did so, they would be labeled informers, and their safety would be jeopardized. Finally, defendants explained that, after much deliberation, they undertook their vigilante activity, because the police were not adequately dealing with the drug problem.

The defendants urge that the trial court erred in excluding as irrelevant both expert and percipient testimony to corroborate their testimony regarding their anti-drug activities. While seventeen witnesses were excluded by the trial judge, nevertheless, he did allow the testimony of five witnesses who did corroborate the defendants' past anti-drug activity. The trial court is vested with discretion in admitting or denying motive evidence, *e. g.*, Zamloch v. United States, 193 F.2d 889, 892 (9th Cir. 1952), and evidence, though relevant, may be excluded at the discretion of the court if its probative value is substantially outweighed by considerations

---

3. It should be noted that the trial court did give forceful cautionary admonitions. *E. g.*,

THE COURT: . . .

From time to time counsel have in their questions inadvertently made reference to matters not before you, and in no way related to this case. Such questions—one such question made reference, for example, to the death of a police officer. Another inferred that the vehicle defendants borrowed was to be used to obtain bail for a man in jail for murder.

You are admonished to ignore all such references. Questions by counsel are not evidence of any kind of nature. And any such references must not be related to any defendant in this case or any issue in this case.

They, too, should be totally and completely ignored by you in your deliberations.

On another occasion defendant Sanchez was questioned as to whether he had been convicted of armed robbery. The inference in such question, I will remind you, was quickly corrected by his response denying his conviction for armed robbery.

To avoid any confusion, however, the Court advises you that defendant Sanchez was not convicted of armed robbery, but of robbery only on that occasion.

Is there any member of the jury who believes he or she cannot follow totally and completely the Court's admonitions and instructions regarding the matters just noted?

If so, please raise your hand.

(Negative response.)

THE COURT: Let the record show no hands have been raised.

Reporter's Transcript 2773–74.

of undue delay, waste of time, or needless presentation of cumulative evidence. *E. g.*, Subcommittee on Criminal Justice, House Committee on the Judiciary, tentative draft of H.R. 5463, 93d Cong., 1st sess., Rule 403 (13 Crim.L.Rptr. 3279, July 18, 1973); Proposed Federal Rule of Evidence 403, 56 F.R.D. 183, 218 (1973); Wigmore on Evidence §§ 1907–08; Rule 45, Uniform Rules of Evidence. While another trial judge may have been more liberal in permitting additional testimony, we cannot conclude from the record that the trial judge abused his discretion.

■ 5. *In Camera Inspection.* A defense motion for production of exculpatory material, including government intelligence files, was made, based on the affidavit of a Eustacio (Frank) Martinez, a former paid government informer. The affidavit in essence stated that he had informed his superiors that La Casa de Carnalismo was not involved in illegal activities but rather in an anti-drug self-help program; that the intention of the government was to close La Casa de Carnalismo; that the government possessed surveillance photos of the appellants among others. The theory of the defense was that the intelligence information would be relevant to the issues of entrapment and bias and motive on the part of prosecution witnesses. The motion was denied without an *in camera* inspection.[4]

The defense on appeal also asserts that the exculpatory information would corroborate the testimony of a defense witness that Agent Canales had prior knowledge of the appellants and La Casa de Carnalismo. Additionally, appellants argue that such information would have served to impeach the testimony of the government agents to the effect of denying prior knowledge.

The government on appeal counterargues that the information would be totally immaterial to the guilt of the defendants and revelation of the informa-tion would not have impeached any critical witness for the prosecution.

■ We agree. Any bias shown would have little, if any, impact upon the determination that the appellants, as they testified, did indeed intend to confront Canales. And any effort to impeach witnesses as to the facts necessary to support a self-defense theory are irrelevant in circumstances, such as these, where such a theory is, at best, tenuous.

### B. *Legal Elements of the Offenses*

The defendants raise two basic legal arguments. First, they assert that knowledge of the federal identity of the victim and funds is an essential prerequisite for conviction under each count. Second, they argue that 18 U.S.C. § 2114—robbery of mail matter, money, or other property of the United States—was not intended by the Congress to encompass their instant conduct. Each shall be examined in turn.

■ 1. *Knowledge of Federal Identity.* Defendants insist that they actually believed that Agent Canales was a drug dealer, and hence, each defendant argues that he was ignorant that Canales was in reality a government agent. The thrust of the government's response to this argument is that defendants' ignorance is irrelevant, that specific knowledge that the victim is a federal agent is not an essential element of forcible assault under 18 U.S.C. § 111. United States v. Kartman, 417 F.2d 893, 894 (9th Cir. 1969); McEwen v. United States, 390 F.2d 47 (9th Cir. 1968).

Both *McEwen* and *Kartman* rely in large part upon United States v. Lombardozzi, 335 F.2d 414 (2d Cir. 1964), cert. denied, 379 U.S. 914, 85 S.Ct. 261, 13 L. Ed.2d 185 (1964). Thus, in *McEwen*, in reference to Section 111, this court adopted a holding of the Second Circuit:

> "The courts should not by judicial legislation change the statute by adding, in effect, the words 'with knowledge that such person is a federal officer'

---

4. With similar affidavit, defense moved for a new trial. This, too, was denied.

[to its provisions]", *Lombardozzi*, supra, p. 416, . . . .

390 F.2d at 50. And similarly in *Kartman*, this court held that

> This interpretation of the forcible assault prohibition in section 111 as requiring only mens rea, and not also specific knowledge of the victim's official status, comports with the legislative purpose, which was simply to provide a federal forum when the enumerated offenses were committed against federal officers engaged in the performance of federal duties. . . . United States v. Lombardozzi, 335 F.2d 414, 416, . . . .

417 F.2d at 895.

The above conclusions adopted by us from *Lombardozzi* were based on the "meager legislative history [suggesting] that in section 111 Congress merely sought to provide a federal forum . . . ." United States v. Lombardozzi, 335 F.2d 414, 416 (2d Cir. 1964). In retrospect, we cannot conclude that the mere intent of the legislation was only to provide a federal forum. While it is true that the Department of Justice sought the legislation so that "[t]he Federal Government should not be compelled to rely upon the courts of the States, however respectable and well disposed, for the protection of its investagative and law-enforcement personnel,'" Ladner v. United States, 358 U.S. 169, 174–175 n. 3, 79 S.Ct. 209, 212 n. 3, 3 L. Ed.2d 199 (1958), nevertheless, the underlying purpose of the legislation as

originally conceded by the government in *Ladner* was " 'to protect the individual officers, as "wards" of the federal government, from personal harm.' " 358 U.S. at 174, 79 S.Ct. at 212.

Indeed, the raison d'être for the statute is the protection of the government officer. The essential question is how may the statute serve to protect the particular agent in the particular circumstances here before us. This is not a case like McEwen v. United States, 390 F.2d 47 (9th Cir. 1968) where the presence of the officers was announced and directed to the defendant by electrically operated megaphone, and where also, the defendant admitted that " 'I had a sneaking hunch that it was policemen. I don't know what individuals—I had no idea what branch.' " *Id.* at 49.[5] Neither is the instant case similar to United States v. Kartman, 417 F.2d 893 (9th Cir. 1969); there the alleged assault occurred upon an individual who was ostensibly engaged in subduing and arresting a demonstrator during a protest at an Armed Forces Induction Center.

In the instant case, not only were the circumstances such that the agent's federal identity was not necessarily obvious, but rather the agent at the time in question was positively and deliberately attempting to disguise that very identity. The more successful in disguising his identity, the more likely the prospect that the defendants would fully accept the agent's feigned role, and thereby subject themselves to increased penalties for a specific crime against a

---

5. Although *McEwen* may be distinguished factually, its holding is less distinguishable:

The rationale for not requiring knowledge or *scienter* as an element of the offense of assaulting a federal officer in the course of performing his duties may be succinctly stated: (1) "The courts should not by judicial legislation change the statute by adding, in effect, the words 'with knowledge that such person is a federal officer' [to its provisions]", *Lombardozzi*, supra, p. 416; and (2) the common law rule that *scienter* was a necessary element in the indictment and proof of every crime has been modified with respect to statutes, the purpose of which would be obstructed by such a requirement.

United States v. Balint, 258 U.S. 250, 42 S. Ct. 301, 66 L.Ed. 604 (1922) ; United States v. Wallace, 368 F.2d 537 (4th Cir. 1966). No violation of due process is involved. *Balint*, supra, 258 U.S. pp. 251–252, 42 S.Ct. 304, citing Shevlin-Carpenter Co. v. State of Minnesota, 218 U.S. 57, 30 S.Ct. 663, 54 L. Ed. 930 (1910). The indictment is sufficient although not charging appellant with knowledge or intent at the time she committed the offense, it being phrased in the language of the statute itself. United States v. Behrman, 258 U.S. 280, 42 S.Ct. 303, 66 L.Ed. 619 (1922).

390 F.2d at 50.

specific, designated victim. There exists in such a situation the strong possibility that if in fact the agent's true identity were known, no such activity would have occurred or even been contemplated.

Hypothetically, it is not unreasonable to assume that injury to a bystander in a public disturbance who happens to be a federal officer might lead to disproportionate penalties to persons who had no reason to suspect or anticipate such status and, as a result, pay an inappropriately harsher price for their ignorance.

If a state law enforcement officer had come upon the scene of this purported sale and, relying upon appearances, had inflicted this very injury, we conceivably could deal with similar legal issues. When, as here, the agent ostensibly gives up his badge and goes undercover, a situation is created which gives rise to misgivings about crimes involving the status of the victim when such knowledge is not an element of the crime. We are, however, also concerned that by recognizing such a defense to defeat federal jurisdiction, a greater evil may be presented.

If knowledge were made an element, conviction, of course, would become dependent upon the state of mind of the defendant, and successful prosecution would necessarily become more speculative. Hence, we would envision prosecutors having to make subtle tactical decisions well in advance of any evidentiary hearing, resulting in bifurcated state and federal prosecutions. In turn, multiple prosecutions would raise a myriad of potential double jeopardy issues.[6]

Opening the floodgates to countless unknown difficulties could only emasculate the protection the Congress intended. We hestitate to take such a step.

There does exist within the legislative branch the potential for statutory change. For example, 18 U.S.C. § 111 as it now exists could be amended with the inclusion of an element requiring scienter. A lesser included offense, not requiring scienter, could also be enacted. Such a tandem would do much to alleviate our misgivings; but it is the Congress which must act, not the judiciary.

We must also note the possibility of different scienter requirements for substantive and conspiratorial crimes. The precise issue of whether scienter is necessary for conviction of conspiracy to violate 18 U.S.C. § 111 has recently been addressed by the Second Circuit in United States v. Alsondo, 486 F.2d 1339 (2d Cir. 1973), cert. granted sub nom., United States v. Feola, —— U.S. ——, 94 S.Ct. 1932, 40 L.Ed.2d 285 (1974). Relying upon the rationale proffered by Judge Learned Hand,

> While one may, for instance, be guilty of running past a traffic light of whose existence one is ignorant, one cannot be guilty of conspiring to run past such a light, for one cannot agree to run past a light unless one supposes that there is a light to run past,

United States v. Crimmins, 123 F.2d 271, 273 (2d Cir. 1941), that Circuit held that scienter is required for proof of conspiracy.

Not only do we have misgivings about substantive offenses involving the status of the victim where scienter is not an element, but we are especially concerned

---

6. California Penal Code § 656 (West 1970) provides: "Whenever on the trial of an accused person it appears that upon a criminal prosecution under the laws of another State, Government, or country, founded upon the act or omission in respect to which he is on trial, he has been acquitted or convicted, it is a sufficient defense."

California Penal Code § 793 (West 1970) is similar: "When an act charged as a public offense is within the jurisdiction of another State or country, as well as of this State, a conviction or acquittal thereof in the former is a bar to the prosecution or indictment therefor in this State."

*See* People v. Belcher, 11 Cal.3d 91, 113 Cal.Rptr. 1, 520 P.2d 385 (1974); People v. Candelaria, 139 Cal.App.2d 432, 294 P.2d 120 (2d Dist.1956); Note, Criminal Law: Conviction or Acquittal in a Federal Court as a Bar to State Prosecution: California Penal Code Section 656, 45 Calif.L.Rev. 197 (1957).

when conspiratorial offenses suffer from the same weakness.

The *Alsondo* court did note that the *Crimmins* rationale has been subjected to criticism. Our circuit has followed such criticism. United States v. Roselli, 432 F.2d 879, 891–892 (9th Cir. 1970), cert. denied, 401 U.S. 924, 91 S. Ct. 883, 27 L.Ed.2d 828 (1971). Considering the state of our own precedent, we would continue to hold that scienter is not a necessary element in conspiracy to assault a federal agent in the performance of his official duties and to steal governmental funds.

The defendants also argue that an essential element of 18 U.S.C. § 2114 is knowledge of the federal nature of the property involved. We would be inclined to hold that the defendants are in error for reasons analogous to the ones immediately above. But since we reverse the conviction of the defendants under Section 2114, we do not reach the issue of knowledge of the federal identity of the property involved.

2. *Construction of 18 U.S.C. § 2114.* Defendants contend that 18 U.S. C. § 2114 [7] makes criminal only assaults with intent to rob property having sufficient connection to the *postal service.* Obviously, in the instant case, there is no connection between the mail system and the federal property here involved, *i.*

*e.,* marked funds in the possession of Agent Canales of the Bureau of Narcotics and Dangerous Drugs. In response, the government argues first that precedent bolsters its position that the property need not be related to the postal service, and second, that the language of the statute is not patently ambiguous and hence there exists no need to examine legislative intent.

As regards the first argument, the government directs our attention to United States v. O'Neil, 436 F.2d 571 (9th Cir. 1970); United States v. Sherman, 421 F.2d 198 (4th Cir. 1970), cert. denied sub nom., Sherman v. United States, 398 U.S. 914, 90 S.Ct. 1717, 26 L.Ed.2d 78 (1970); Peek v. United States, 321 F.2d 934 (9th Cir. 1963); Lockhart v. United States, 293 F.2d 314 (8th Cir. 1961); Banks v. United States, 239 F.2d 409 (7th Cir. 1957). These cases render little support to the government. The latter two cases, *Lockhart* and *Banks, did* involve *postal* money. And in the former three cases, the defendants there did not raise nor did the respective courts decide upon the issue presently before us: must there be a nexus between the property taken and the postal service?

Our reading of the statute leads us to conclude that the wording employed in amendment of its predecessor [8] in 1935

---

7. 18 U.S.C. § 2114 provides:

Whoever assaults any person, having lawful charge, control, or custody of any mail matter or of any money or other property of the United States, with intent to rob, steal, or purloin such mail matter, money, or other property of the United States, or robs any such person of mail matter, or of any money, or other property of the United States, shall, for the first offense, be imprisoned not more than ten years; and if in effecting or attempting to effect such robbery he wounds the person having custody of such mail, money, or other property of the United States, or puts his life in jeopardy by the use of a dangerous weapon, or for a subsequent offense, shall be imprisoned twenty-five years.

8. The Act of March 4, 1909, Ch. 321, § 197, 35 Stat. 1126, provided:

Whoever shall assault any person having lawful charge, control or custody of any mail matter, with intent to rob, steal or purloin such mail matter or any part thereof, or shall rob any person of such mail or any part thereof, shall, for a first offense, be imprisoned not more than ten years; and if in effecting or attempting to effect such robbery, he shall wound the person having custody of the mail, or put his life in jeopardy by the use of a dangerous weapon, or for a subsequent offense, shall be imprisoned twenty-five years.

The Act of August 26, 1935, Ch. 694, 49 Stat. 867, in comparison, read:

Whoever shall assault any person having lawful charge, control, or custody of any mail matter or of any money or other property of the United States, with intent to rob, steal, or purloin such mail matter, money, or other property of the United

is sufficiently ambiguous to raise the question of legislative history. Once legislative history is consulted a more precise focus is obtained. In 1935 the terminology "money" and "other property" was added to the statute which had previously contained only references to "mail matter." The congressional discussion is as illuminating as legislative history could possibly be:

> The *only purpose* of the pending bill is to extend the protection of the present law to property of the United States in the *custody of its postal officials,* the same as it now extends that protection to mail matter in the custody of postal officials. Aside from that, it makes no change in the law. It just includes property of the United States in addition to mail matter which is protected; and let me say there are many custodians of postal stations who have a great amount of money in their custody but little mail; for instance, in those substations where money orders are sold. If a bandit attacks these employees seeking that money, there is no way to prosecute the bandit under the present law, but if he is merely after a postal card or a letter he can be prosecuted.

79 Cong.Rec. 8205 (1935) (emphasis added).

The convictions as to Count II were in error.

In conclusion, the convictions and sentences upon counts one and three are affirmed; the convictions and sentences upon count two are reversed and dismissed.

HUFSTEDLER, Circuit Judge (concurring specially):

The law of this circuit, expressed in United States v. Kartman (9th Cir. 1969) 417 F.2d 893 and McEwen v. United States (9th Cir. 1968) 390 F.2d 47, is that a defendant's actual or implied knowledge that his victim was a federal law enforcement officer is not an element of the offense defined by 18 U.S.C. § 111. I concur solely under the compulsion of the law of the circuit, but I express my reasons for believing that these Ninth Circuit cases and the cases on which they rely are wrong.[1]

Section 111 does not explicitly state that Congress intended to punish conduct by persons who were ignorant of their victim's official status. This fact, however, begins rather than ends our inquiry. Congress' failure to specify that knowledge of the victim's status was an element of the offense does not compel the conclusion that knowledge is not required. Although Congress could easily have said that knowledge was an element (United States v. Lombardozzi (2d Cir. 1964) 335 F.2d 414), it could as easily have expressly deleted knowledge as an element (*cf.,* Morissette v. United States (1952) 342 U.S. 246, 72 S.Ct. 240, 96 L. Ed. 288). Its failure to be precise does not suggest that the opposite of either was intended; rather it suggests that Congress failed to appreciate that there

States, or any part thereof, or shall rob any such person of such mail matter, or of any money, or other property of the United States, or any part thereof, shall, for the first offense, be imprisoned not more than ten years; and if in effecting or attempting to effect such robbery he shall wound the person having custody of such mail, money, or other property of the United States, or put his life in jeopardy by the use of a dangerous weapon, or for a subsequent offense, shall be imprisoned twenty-five years.

1. The Supreme Court has the opportunity to decide whether knowledge of the victim's official status must be proved before one may be convicted of conspiring to violate section 111. (United States v. Alsondo (2d Cir. 1973) 486 F.2d 1339, cert. granted sub nom. United States v. Feola, —— U.S. ——, 94 S. Ct. 1932, 40 L.Ed.2d 285 (1974) (No. 73–1123); United States v. Farr (2d Cir. 1973) 487 F.2d 1023, petition for cert. filed 42 U. S.L.W. 3379 (U.S. Dec. 19, 1973) (No. 73–953).) Implicit in that question is the question of whether knowledge is an element of the underlying substantive offense. Despite the probability that *Feola* will be relevant to the issues raised here, we do not hold this case further because it has been long pending and the *Feola* decision is not imminent.

was a need for Congress to voice a clear judgment on the matter.

Although the legislative history of section 111 is sparse, the hints of congressional intent all indicate that knowledge was to be an element of the crime. The statutory ancestor of section 111 was codified as former 18 U.S.C. § 254, which was enacted in 1934 against a background of several laws (formerly codified as 8 U.S.C. § 152 and 18 U.S.C. §§ 118, 121, 245) proscribing certain offenses against specialized federal law enforcement officers. (*See* Ladner v. United States (1958) 358 U.S. 169, 174–175 n. 3, 79 S.Ct. 209, 3 L.Ed.2d 199.) The legislative history of former section 254 reveals that that section was intended to extend to other federal officers the same kind of protection that its predecessor statutes had given to various specialized officers. (*Id.*) Among the prior statutes, former 18 U.S.C. § 245 expressly required proof of knowledge, and former 18 U.S.C. § 121 had, prior to 1934, been consistently interpreted to require proof of knowledge even though the statute itself was silent on the point. (*See* Gay v. United States (5th Cir. 1926) 12 F.2d 433, 434–435; United States v. Page (W.D.Va.1921) 277 F. 459, 460; *cf.* Moore v. United States (5th Cir. 1932) 57 F.2d 840, 843; Hlabse v. United States (6th Cir. 1927) 20 F.2d 482.) [2]

The law with regard to analogous offenses was fairly uniform in requiring proof of scienter. (*See* Pipes v. United States (5th Cir. 1968) 399 F.2d 471, 476 (dissenting opinion); United States v. Taylor (E.D.Va.1893) 57 F. 391.) The then most recent Supreme Court case on

an analogous issue had held proof of knowledge required even though the statute there in question did not explicitly demand such proof. (Pettibone v. United States (1893) 148 U.S. 197, 13 S.Ct. 542, 37 L.Ed. 419.) Because former section 254 was expressly based on prior laws, this background strongly suggests that Congress thought that its new law would require knowledge whether or not Congress so specified.[3]

The wording of former section 254 also suggests that Congress meant proof of knowledge to be necessary to a conviction under the section. Former section 254 provided in pertinent part, "Whoever shall forcibly resist, oppose, impede, intimidate, or interfere with any [of certain designated federal officers] while engaged in the performance of his official duties, or shall assault him on account of the performance of his official duties, shall be [subject to prescribed punishment]." Assault is treated differently in former section 254 than the other enumerated acts. The section does not proscribe assaults on officers "in" the performance of their duties; rather it makes punishable only assaults on officers "on account of" the performance of their duties. This difference in treatment was apparently an attempt to inject into the assault offense a knowledge element that might not be there naturally. The words "resist," etc., imply that knowledge is an element of the crime. Similarly, the phrase "on account of" has been interpreted as inherently requiring knowledge of official function. (United States v. Chunn (4th Cir. 1965) 347 F.2d 717, 721–722; Portnoy v. United States (1st Cir. 1963) 316

---

2. Cases decided after 1934 continued to interpret former section 121 as requiring proof of knowledge. (*See* Sparks v. United States (6th Cir. 1937) 90 F.2d 61, 63; *cf.* Armes v. United States (7th Cir. 1935) 77 F.2d 163, 164.)

3. It is unlikely that the fact that one of the predecessor statutes, former section 245, explicitly required proof of knowledge would imply that former section 254, not explicitly so requiring, did not include a scienter ele-

ment. Former section 254 was meant to mirror substantively its predecessors, including former section 245. The fact that former section 121 was interpreted as implicitly requiring knowledge may have led Congress to the conclusion that the explicit statement in former section 245 was surplusage. Furthermore, the wording of former section 254 embodied a clearer implication of a knowledge requirement than any of its predecessors other than former section 245.

F.2d 486, 488. *See also* Finn v. United States (9th Cir. 1955) 219 F.2d 894.) The structure of former section 254 should therefore be viewed as reflecting an attempt by Congress to conform assault, a crime that normally has no scienter requirement, to resistance, etc., crimes for which knowledge is normally required. Indeed, the different treatment given assault is difficult to explain on any basis other than that, by so wording the statute, Congress included an implicit knowledge requirement in the assault offense proscribed by former section 254.

When Title 18 was revised in 1948, former section 254 and former section 118 were combined and the blend was codified as 18 U.S.C. § 111. (Reviser's Note, 18 U.S.C. § 111.) The revision removed the different manner in which assault had been treated in former section 254. The 1948 revision reflects no intent to remove the knowledge requirement from former section 254; the alteration was merely a way to merge the former sections without undue grammatical difficulties. *See id.; cf.* Morissette v. United States, *supra,* 342 U.S. at 266–267, 269 n. 28.)

Clues from the legislative history that Congress intended knowledge to be an element of the offense are reinforced by an analysis of the purposes that could have been served by creating the federal offense defined by section 111 and its predecessor. Congress could have thought that the federal courts would better protect federal officers from the proscribed conduct than the state courts. (*Cf.* United States v. Goodwin (3d Cir. 1971) 440 F.2d 1152, 1155; United States v. Kartman, *supra,* 417 F.2d at 895; United States v. Wallace (4th Cir. 1966) 368 F.2d 537, 538–539; United States v. Lombardozzi, *supra,* 335 F.2d at 416.) There are suggestions, however, that Congress was not concerned about the quality of justice that was

available in state courts. The legislative history of section 111 indicates that Congress wanted the statute passed "however respectable and well disposed" the state courts were. (Ladner v. United States, *supra,* 358 U.S. at 175, n. 3.)

Even if section 111 were intended as a forum shifting device, it was also intended to be a substantive proscription. It is not like a removal statute (*cf., e. g.,* 28 U.S.C. § 1442) or a federal criminal law which merely incorporates state law by reference (*cf., e. g.,* 18 U.S.C. § 13). The federal law does not merely effect a change in the forum in which cases of assault on a federal officer will be tried; it also creates a substantive proscription even where state laws do not (compare definition of assault in Cal.Penal Code § 240 with that in Ladner v. United States, *supra,* 358 U.S. at 177; *cf.* United States v. Anderson (7th Cir. 1970) 425 F.2d 330), and authorizes punishment to an extent that state laws do not (compare punishment for simple assault in Cal.Penal Code § 241 with punishment in 18 U.S.C. § 111).[4] Section 111, therefore, manifests not only a possible concern that cases involving assaults on federal officers be tried in a federal forum, but also a desire that the minimum scope of and punishment for the crime be controlled by federal law. Thus, even though enactment of section 111 may have been influenced by a congressional desire to have certain cases tried in federal court, it was also motivated, as is any criminal law, by a desire to deter proscribed conduct.

If the statute had been designed simply to adjust the forum in which the cases are tried, a defendant's knowledge that his victim was a federal officer would be irrelevant. But section 111 creates a new substantive crime, and does not merely effect a change in forum. Whether knowledge is an element of the offense depends, therefore, on the nature of the crime that Congress in-

4. Note that California's augmented punishment for assault on a peace officer does not apply when the person assaulted is a federal officer.

tended to proscribe when it enacted section 111 and its predecessors.[5]

Section 111 is often treated as if it were the federal analog of a state simple assault statute. (*See,* United States v. Kartman, *supra,* 417 F.2d at 895; *cf.* United States v. Young (5th Cir. 1972) 464 F.2d 160, 163.) When the section is so viewed, the specification that section 111 applies only to those assaults that are on federal officers seems to be merely a jurisdictional element of the crime. Thus, Congress might have intended to deter all assaults by proscribing as many assaults as it felt constitutionally empowered to punish; the reference to federal officers acting in the performance of federal duties would then, like most references to interstate commerce in federal criminal statutes, be no more than a jurisdictional requirement. However, section 111 is not a simple assault statute. For two related reasons, discussed below, the status of the victim must be regarded as a substantive rather than a jurisdictional element of the crime defined by the section. The mischaracterization has led courts to ignore aspects of section 111 that imply that knowledge is an element of the crime.

First, section 111 should not be interpreted as a simple assault statute because the gist of the section is not prevention of assaults, but rather facilita-

tion of certain federal officials' law enforcement efforts. An assault statute is designed to protect persons. An obstruction of justice statute, on the other hand, is ultimately designed to protect official functions; if an obstruction of justice statute protects persons, it does so only as a means of protecting those individuals' functions. The basic purpose of section 111 is preventing obstruction of justice. (*See* Hargett v. United States (5th Cir. 1950) 183 F.2d 859, 864–865.) The Supreme Court in Ladner v. United States, *supra,* indicated that section 111 should be interpreted to reflect the view that "the congressional aim was to prevent hindrance to the execution of official duty, and thus to assure the carrying out of federal purposes and interests, and was not to protect federal officers except as incident to that aim. Support for this meaning may be found in the fact that [section 111] makes it unlawful not only to assault federal officers engaged on official duty but also forcibly to resist, oppose, impede, intimidate or interfere with such officers. Clearly one may resist, oppose, or impede the officers or interfere with the performance of their duties without placing them in personal danger." (358 U.S. at 175–176.) When a statute defines an offense by listing several words disjunctively, the words

5. Congress did not seek by enactment of section 111 to adjust the forum for all crimes the victims of which were federal officers. (*See* 78 Cong.Rec. 8126–27 (1934).) Congress sought rather to make only certain crimes triable in federal court. "Certain", in this regard, can only be defined by looking to the substantive scope of section 111's proscription; Congress sought to make triable in federal court only those crimes that section 111 is designed to deter. Thus it is the substantive purpose of the statute, rather than its forum shifting purpose, that ultimately determines what must be proved to support a conviction. Failure to appreciate this relationship is one of the basic errors of those cases that hold that section 111 is merely designed to provide a federal forum. The cases purport to determine that knowledge is not an element of the crime defined by section 111 by holding that section 111 was designed "to provide a federal forum for

the trial of cases involving *various offenses* against federal officers in the performance of official duties." (United States v. Lombardozzi (2d Cir. 1964) 335 F.2d 414, 416 (emphasis added); *see* United States v. Goodwin (3d Cir. 1971) 440 F.2d 1152, 1155 (to provide a federal forum for "the enumerated offenses"); United States v. Kartman (9th Cir. 1969) 417 F.2d 893, 895 (same).) Because, however, the cases failed to define the elements of the "various offenses" for which the federal forum was provided, the courts actually avoided the issue they purported to resolve. The cases ignore the fact that the forum shifting effect of section 111 has no impact on the elements of the crime with regard to which the forum is shifted; section 111 could as easily have been intended to provide a federal forum for cases of assault with knowledge of the victim's status as for cases of assault without such knowledge.

should, to the extent possible, be read in the same manner. (*Cf.* Morissette v. United States, *supra,* 342 U.S. at 266–269.) In *Ladner* the Supreme Court held, albeit in a somewhat different context, that the assault offense in this statute should be limited to conform to the scope reasonably given to the other words defining the offense proscribed by section 111. (358 U.S. at 176–177.)

Obstruction of justice laws implicitly contain a knowledge requirement. Statutory offenses of this sort have their roots in the common law, and at common law scienter was an element of the offense. (*E. g.,* City of Seattle v. Gordon (Wash.1959), 54 Wash.2d 516, 342 P.2d 604, 606; *cf.* Morissette v. United States, *supra,* 342 U.S. at 258–259; United States v. Balint (1922) 258 U.S. 250, 251, 42 S.Ct. 301, 66 L.Ed. 604. *See also* Hargett v. United States, *supra,* 183 F. 2d at 864–865.) Unless Congress specifies otherwise, federal criminal statutes are to be interpreted to require proof of the same mental elements that were required for their common law ancestors. (*See* Morissette v. United States, *supra.*)[6] Furthermore, the knowledge requirement is well suited to the purpose of an obstruction of justice law. The

law is designed to affect the behavior of individuals toward the administration of justice, and the relevant behavior of the individual is not implicated unless he knew or had notice that justice was being administered by the person with whom he interfered. (*Cf.* Pettibone v. United States, *supra.*) Resisting, opposing, impeding, or interfering with another are not generally proscribed as wrongful under criminal or even civil laws. Were knowledge not required in obstruction of justice offenses described by these terms, wholly innocent (or even socially desirable) behavior could be transformed into a felony by the wholly fortuitous circumstance of the concealed identity of the person resisted. (*Cf.* Rewis v. United States (1971) 401 U.S. 808, 812, 91 S.Ct. 1056, 28 L.Ed.2d 493.) Accordingly, the courts have been reluctant to say that knowledge is not an element of the non-assault varieties of the offense defined by section 111. (*See* United States v. McKenzie (2d Cir. 1969) 409 F.2d 983, 986; United States v. Rybicki (6th Cir. 1968) 403 F.2d 599, 601–602; Burke v. United States (5th Cir. 1968) 400 F.2d 866, 868; *cf.* United States v. Wallace, *supra,* 368 F.2d at 538.)[7] Thus, while the word "assault" in

---

6. *Morissette* decided that unless it was clear that Congress intended otherwise, courts should require proof of felonious intent for conviction of a federal larceny-type offense, even though the statute defining the offense omitted mention of an intent requirement. Obviously, because *Morissette* was interpreting a statute defining a larceny-type offense, its language focuses on such offenses. Nonetheless, it is apparent that the principle enunciated in *Morissette* was meant to apply in all cases where the crime defined by the statute has its roots in the common law of crimes. (342 U.S. at 262–263.) The suggestion in United States v. Kartman (9th Cir. 1969) 417 F.2d 893, 894–895, that it is not inconsistent with *Morissette* to hold that proof of knowledge is not required under section 111 seems unreasonable. The suggestion would be reasonable only if the status of the victim were not a *substantive* element of the crime defined by section 111. The status of the victim would be not a substantive element only if section 111 were *solely* a forum shifting device or if mention of the status of the victim were *solely* to es-

tablish federal jurisdiction. As the text indicates, neither of these views of section 111 is tenable. Because the specification that section 111 applies only to assaults on federal officers is a substantive element, *Morissette* implies that mens rea with regard to that element should not be read out of the statute unless Congress clearly so intended.

7. Admittedly, some courts have overcome their reluctance. (United States v. Goodwin (3d Cir. 1971) 440 F.2d 1152, 1155–1156; United States v. Ulan (2d Cir. 1970) 421 F. 2d 787, 788–789.) The logic that supports their conclusion, however, is backward. They assume that knowledge is necessarily not an element of the assault offense defined by section 111. Then, because it would not be proper to interpret different parts of section 111 differently (*Goodwin* correctly cites Ladner v. United States (1958) 358 U.S. 169 for this proposition), they conclude that "resist," etc., must be given as broad a scope as "assault" has been given. In doing so they make the tail wag the dog. These courts fail to realize that "assault" need not

a criminal law generally does not imply that knowledge is an element of the offense, the word "assault" in section 111 must be viewed in light of its context. Because the statute as a whole is directed toward the prevention of interferences with federal law enforcement personnel, and because knowledge is an element of such a statute, the word "assault" in section 111 must be read more narrowly than it would be in a simple assault statute; a showing of knowledge is required.

The second reason that section 111 should not be interpreted as a simple assault statute is that, to the extent that section 111 prohibits assault, it is best viewed as defining an aggravated assault offense.[8] The assault portion of the offense defined by section 111 seems to be an attempt to create a federal crime analogous to the state offense of assault on a peace officer. Section 111 does not proscribe assaults on any federal officer or employee; it was initially conceived as a protection only for federal investigative and law enforcement personnel. (*See* Ladner v. United States, *supra*, 358 U.S. at 175 n. 3; 18 U.S.C. §§ 111, 1114; 78 Cong.Rec. 8126 (1934).) Probably motivating the enactment of the assault portion of section 111 was a congressional desire to fill a gap in the state laws defining aggravated assaults: state laws mandated increased punishment only for assaults on state peace officers (*cf., e. g.,* People v. Garfield (Utica City Ct. 1970) 63 Misc.2d 79, 312 N.Y.S.2d 830; Cal.Penal Code §§ 241, 830.1, 830.2, 830.6(a)); if the person assaulted was a federal officer, the assailant would only be punishable under state law for simple assault. Section 111 accordingly provides for punishment in excess of that which states would impose (*compare* 18 U.S.C. § 111 *with, e. g.,* Cal.Penal Code § 241) for assaults on those involved in the investigation or enforcement of federal laws.

A statute proscribing assaults on peace officers should be interpreted as requiring proof of knowledge of the status of the victim. While it is conceivable that a state might wish to augment the punishment for assaults on peace officers whether or not the assailant knew that his victim was a peace officer, it is extremely unlikely that it would do so. (*See e. g.,* In re Cline (1967) 255 Cal. App.2d 115, 63 Cal.Rptr. 233, 239; People v. Prante (Colo.1972) 493 P.2d 1083, 1085; People v. Litch (1972), 4 Ill.App. 3d 788, 281 N.E.2d 745, 747; Ford v. State (Tex.Cr.App.1952), 158 Tex.Cr.R. 26, 252 S.W.2d 948.) The deterrent effect of such a law would be slight; assailants would so discount the risk that an apparently non-official victim was a federal officer that section 111's penal-

---

be (and in light of the former wording of the statute cannot be) viewed as the dominant word in the statute. Rather than modifying the natural meaning of "resist," etc., to conform to the broader meaning of "assault," courts should limit the meaning of "assault" to conform it to the rest of the statute. Of particular note is that *Ladner*, the case relied on in *Goodwin*, refused to give the assault offense broad impact because to have done so would have required similar but unreasonable impositions of liability under the other section 111 offenses. (Ladner v. United States, *supra* at 176–177.) The same preference for a narrowing interpretation should be applied in this case. Because it would be unreasonable to convict one for resisting an officer he did not know was an officer, a similar knowledge requirement should be read into the assault offense defined by section 111.

8. This characteristic distinguishes section 111 from other federal crimes with state law analogs. For example, murder of a peace officer is not an aggravated form of murder. Either would be as wrong; the penalties in either case would be the same. Similarly, theft of government property is not an aggravated theft offense. Thus the scienter requirement that is a natural element of aggravated offenses need not be implied in either 18 U.S.C. § 1114 (*compare* Hargett v. United States (5th Cir. 1950) 183 F.2d 859, 864, *with* McNabb v. United States (6th Cir. 1941) 123 F.2d 848, rev'd on other grounds 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943)) or 18 U.S.C. § 641 (*cf.* United States v. Howey (9th Cir. 1970) 427 F.2d 1017).

ties would cease to be a deterrent factor. (*See* United States v. Alsondo (2d Cir. 1973) 486 F.2d 1339, 1343, 1344–1345.) If an assailant attacks one who is covertly a peace officer, the only social policies that really are implicated are those underlying the proscription against simple assault. If, however, the assailant knows his victim to be a peace officer, the assailant's acts take on a more sinister character, and society's interest in punishing the assailant becomes greater. In essence the criminal assaults "the law" rather than merely the officer. Society's concern for the person of the officer is amply reflected in a simple assault statute; the enhanced punishment of the aggravated offense is reflective of the state's concern for the integrity of law itself.[9] If the mens rea requirement for the crime of assault on a peace officer is to bear an appropriate relation to the interests that demand augmented punishment for such aggravated assaults, the mens rea requirement must include a requirement that the assailant knew or should have known that his victim was a peace officer. Section 111 should be interpreted in the same manner as its state law analog; proof of knowledge should therefore be required. Indeed, to hold that knowledge is not required with regard to each substantive element of the assault offense defined by section 111, is inconsistent with the teaching of Morissette v. United States, *supra.*

Congress desired to deter not all, but only certain assaults—those on federal law enforcement officers—and its desire to deter such assaults was less the product of solicitude for the individual officer than of concern for the effectiveness with which federal functions were performed. (*See* Ladner v. United States, *supra,* 358 U.S. at 174–177.) Section 111 may therefore not be interpreted as if Congress desired it to have a broad

anti-assault impact. (*See also* 78 Cong. Rec. 8127 (1934) (remark of Representative Sumners).) Undue expansion of federal criminal jurisdiction was unacceptable to the Congress that adopted the statute that now is section 111. (*Id.*) In refusing to enact a federal simple assault statute, Congress was seeking to avoid creation of a federal crime that was wholly duplicative of a state crime. Its refusal was consistent with its effort to minimize federal intrusions upon exclusive state criminal jurisdiction.

The overriding purpose of section 111 is the protection of federal law enforcement functions and that purpose is best served by requiring that the potential offender knows his victim's official status.

Fear expressed in this circuit and sometimes elsewhere that a knowledge element would weaken the effectiveness of section 111 is based on the idea that persons charged with the offense would be harder to convict if the government had to prove knowledge. That fear, even if founded, is irrelevant, as the Supreme Court observed in Morissette v. United States, *supra* (holding that criminal intent was required to be proven under a criminal conversion statute even though the statute omitted mention of such a requirement): "Of course, the purpose of every statute would be 'obstructed' by requiring a finding of intent [or, in the case at bench, knowledge], *if we assume that it had a purpose to convict without it.* Therefore, the obstruction rationale does not help us to learn the purpose of the omission by Congress." (342 U.S. at 259 (emphasis and bracketed material added).)

Even if difficulty of proof were relevant, however, proof of the knowledge element in section 111 is not unduly burdensome. Knowledge in this context is

---

9. It is because their underlying policies are so nearly the same that both an obstruction of justice offense and an aggravated assault offense seem to be defined by section 111. The two offenses are, however, probably not different at all, but are rather the same offense differently characterized. Each has as its ultimate purpose something other than the protection of the person assaulted; each serves that purpose by protecting from assaults those involved in the enforcement of the law.

not limited to actual knowledge of the fact of the victim's status but also includes knowledge of facts that would lead a reasonable person to believe that the victim was or could be a law enforcement officer. (*Cf.* Hall v. United States (5th Cir. 1956) 235 F.2d 248; Carter v. United States (5th Cir. 1956) 231 F.2d 232.) [10]

Any doubt that Congress intended to include knowledge as an element of the section 111 offense must be resolved in favor of the defendants, as the Supreme Court has repeatedly and emphatically stated. (*E. g.,* United States v. Bass (1971) 404 U.S. 336, 347–350, 92 S.Ct. 515, 30 L.Ed.2d 488; Ladner v. United States, *supra,* 358 U.S. at 177–178; Jerome v. United States (1943) 318 U.S. 101, 104–105, 63 S.Ct. 483, 87 L.Ed. 640.) If Congress is dissatisfied with the narrow interpretation of section 111, it has the power and the duty to clarify the statute.

10. Other difficulties that are perceived in interpreting the statute to require knowledge, such as procedural complications or potential double jeopardy problems, are neither created nor solved by recognizing or refusing to recognize the knowledge element. They are problems either inherent in judicial process or in our dual sovereignty system. Fear that a miscreant will escape unscathed from both systems via double jeopardy is not well founded. (Abbate v. United States (1959) 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729; Bartkus v. Illinois (1959) 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684.) These decisions have not been eroded by subsequent Supreme Court authority. (*Cf.* Robinson v. Neil (1973) 409 U.S. 505, 510, 93 S.Ct. 876, 35 L.Ed.2d 29; Waller v. Florida (1970) 397 U.S. 387, 392, 90 S.Ct. 1184, 25 L.Ed.2d 435.) While Ashe v. Swenson (1970) 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469, somewhat broadened the impact of the double jeopardy clause, it only affected relitigation of an issue between "the same parties" (397 U.S. at 443). Because the state and federal governments, being separate sovereigns, are not the same party, *Ashe* does not undermine *Abbate* and *Bartkus.* Thus, in *Waller,* a case decided the same day as *Ashe,* the Court declined an opportunity either to disapprove *Abbate* and *Bartkus* or to suggest

application of *Ashe's* principle in the separate sovereign context. Any fears that California's statutory double jeopardy provisions (*see* Cal. Penal Code §§ 656, 793) would bar state prosecutions where an assailant has been acquitted of the federal crime, do not seem to be legitimate concerns of this court. We cannot convict under federal law those that Congress did not intend to convict merely because the laws of California would prevent California from trying an assailant for a lesser but related offense. Even if in enacting section 111 Congress relied on the states' ability to prosecute lesser offenses, that that reliance was in certain particulars ill founded is a problem to be remedied by Congress and not the courts.

Even were that California double jeopardy law and the consequent risk that assailants might be immunized from state prosecution concerns to which this court could legitimately give weight, they are of slight weight at best. The California law is of significance only if the federal prosecution precedes the state prosecution; a state conviction or acquittal does not bar federal prosecution. Thus, if a federal prosecutor entertains any doubts at all about his ability to prove scienter, he need merely await the outcome of the state prosecution.